# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### February 15, 2012 Session at Nashville

## STATE OF TENNESSEE v. HUBERT GLENN SEXTON

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Scott County**
**No. 7685      E. Shayne Sexton, Judge**

---

**No. E2008-00292-SC-DDT-DD - Filed May 29, 2012**

---

The defendant, tried and convicted of two counts of first degree murder, was sentenced to death for each offense. The Court of Criminal Appeals affirmed. In our review, we have found that the trial court erred by admitting detailed evidence of a prior claim of child sex abuse and by allowing references to the defendant's refusal to submit to a polygraph examination. Further, the record demonstrates several instances of prosecutorial misconduct during the opening statement and during the final arguments of both the guilt and penalty phases of the trial. Because, however, the defendant admitted to at least three witnesses that he committed the murders and the evidence of guilt was otherwise overwhelming, the errors had no effect on the verdicts rendered at the conclusion of the guilt phase of the trial. Each of the convictions is, therefore, affirmed. Nevertheless, because certain of the inadmissible evidence was particularly inflammatory and the prosecution made several inappropriate comments, the sentences of death must be set aside. The Court of Criminal Appeals is, in consequence, affirmed in part and reversed in part. The cause is remanded to the trial court for new sentencing hearings.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals**
**Affirmed in Part and Reversed in Part**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Larry M. Warner, Crossville, Tennessee, and Leif E. Jeffers, Assistant Public Defender, Huntsville, Tennessee (at trial); William P. Redick, Jr., Whites Creek, Tennessee, and Peter D. Heil, Nashville, Tennessee (amended motion for new trial); James A. Simmons, Hendersonville, Tennessee, and Richard L. Gaines, Knoxville, Tennessee (final amended motion for new trial and on appeal), for the appellant, Hubert Glenn Sexton.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Gordon W. Smith, Associate Solicitor General; Mark E. Davidson and James E. Gaylord, Assistant Attorneys General; William Paul Phillips, District Attorney General; and John W. Galloway, Jr., Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

On the night of May 20, 2000, a Saturday, Stanley Goodman and his wife, Terry Sue Goodman, were shot to death as they slept in their bed at their residence in Scott County. Their bodies were discovered the next morning by Mr. Goodman's minor daughter, E.G., who resided in their home.[1] The murders took place four days after another of Mr. Goodman's minor daughters, B.G., reported to authorities that she had been sexually abused by her stepfather, Hubert Glenn Sexton (the "Defendant"). At the time, the Defendant and his wife, Sherry Sexton, lived in Bradley County with the Defendant's daughter, B.S., and E.G.'s younger sister, B.G., and brother, Br.G., both of whom were Ms. Sexton's children by her marriage to Mr. Goodman.

Within days of the crimes, the Defendant was arrested and charged with two counts of first degree murder. See Tenn. Code Ann. § 39-13-202 (1997). On July 18, 2000, the district attorney general filed a notice seeking the death penalty for each of the murders. See Tenn. R. Crim. P. 12.3(b). The aggravating circumstance relied upon by the State for each of the two offenses was that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6) (1997 & Supp. 1999); see also Tenn. R. Crim P. 12.3(b)(2).

### Guilt Phase of the Trial

Hope Tharp, who served as the Child Protective Services Team Leader for the Department of Children's Services ("DCS") for Bradley County and several of its surrounding counties, first interviewed B.G. and Ms. Sexton in Bradley County on March 17, 2000, at the request of the Scott County DCS, as part of an investigation of possible child sexual abuse by the Defendant. The Defendant and Ms. Sexton had lived at the Goodman residence before moving to Bradley County. No charges resulted from the complaint.

Two months later, on May 16, 2000, Ms. Tharp received a report from authorities at Black Fox Elementary School in Cleveland that B.G., age 8, had made an allegation of sexual abuse by the Defendant. Based upon B.G.'s statement that the sexual abuse had occurred on the previous night, Ms. Tharp immediately notified Ms. Sexton and scheduled a meeting with

---

[1] E.G., who testified for the State, was fourteen years old at the time of the trial on June 27, 2001; consistent with Court policy, the minor children are identified only by their initials.

the Sextons at 4:00 p.m. that afternoon. When the Defendant and the Sextons' daughter B.S. failed to arrive at her office at the time of the meeting, Ms. Tharp sought the assistance of the Bradley County Sheriff's Department. After being notified that officers had found the Defendant at his residence, Ms. Tharp traveled there to meet with him and to explain the basis for DCS taking custody of the three children in the Sexton household. Three officers were present. The Defendant, after being warned that he could be arrested for custodial interference, provided information as to B.S.'s whereabouts. Ms. Tharp, who by that time had interviewed the three children living in the Sexton home, all of whose statements were identical, then explained to the Defendant that he would have to come to her office for questioning. Over objection by the Defendant, Ms. Tharp testified that she informed him that B.G. had claimed that she had been required to "close her eyes and open her mouth," to "put her mouth on his penis and suck it," and that "if she told she would never see her dad again." According to Ms. Tharp, the Defendant, upon hearing the accusation, stood from his chair, denied the truth of the allegations, and responded, "Well, she is getting this information from her sister, [E.G.], and her father." He insisted that B.G. had made up the story and that Mr. Goodman had "put her up to it." He also claimed that Mr. Goodman had telephoned him some three months earlier and played an audiotape recording of Mr. Goodman coaching B.G. to say "things." When Ms. Tharp advised the Defendant that his statement was inconsistent with that of B.G. and the other two children and that if he "did these things," he should confess and get treatment, he remarked, "Well, I can go over and sign papers saying I did it and serve two or three years in jail and we can be a family again." Ms. Tharp then explained, "That's not the way it works . . . . [I]f you go over and say you did it, and you go to jail for this . . . , you can't just come out of jail and be a family again."

Bradley County Sheriff's Deputy Jerry Kyle Millsaps, who went to the Sexton residence to assist DCS, overheard the Defendant complain to Ms. Sexton about "her family causing them problems" and say, "they think I'm guilty here already." He also overheard the Defendant proclaiming his innocence of child sex abuse and stating that he "was not going to jail for . . . a child abuse charge [and that i]f I go to jail for anything, it would be for murder." When questioned by the State at trial, Officer Millsaps also made reference to a possible polygraph examination for the Defendant, who initially consented to the test. On re-direct examination, and over objection by the Defendant, the State was permitted to ask, "Are you aware that when Mr. Sexton . . . was later given the opportunity to take the polygraph test, [he] wouldn't?" The officer responded in the negative.

On the same date DCS received the sex abuse complaint, Detective Tony Alvarez of the Bradley County Sheriff's Department became involved in the investigation. After driving to the school and speaking with B.G., Detective Alvarez provided the Defendant with

<u>Miranda</u>[2] warnings and then questioned him. The Defendant contended that Mr. Goodman was responsible for the charge made by B.G. and had persuaded "the children to trump up some false allegations." He claimed that Mr. Goodman was motivated by his displeasure with the Sextons' decision to move out of the Goodman home in Scott County to a residence in Bradley County, taking two of the three Goodman children with them.

Later in the week, Mr. Goodman, having been apprised of the investigation, contacted Detective Alvarez, informing him that he intended to file a petition in Bradley County on the following Monday seeking custody of the children. Afterward, the detective informed the Defendant of Mr. Goodman's plan. When, during this conversation, Detective Alvarez asked the Defendant about taking a polygraph examination regarding the sex abuse allegation, the Defendant declined, explaining that Special Agent Skip Elrod had informed him that polygraphs could be "fixed."

In the week before the murders, the Defendant informed Preston Adams, a co-worker, of the child abuse charge, told him that Mr. Goodman was responsible, and asked where he might acquire a .22 or .25 caliber handgun so that he could "try to take care of the matter before it could escalate." On Saturday, May 20, the Defendant worked in construction with Adams from 8:00 a.m. to 12:30 p.m. During that time, he told Adams he had not "had any sexual contact with the children." As the two men left the job site, the Defendant informed Adams that he "was not going to let [Mr. Goodman] come down [to Bradley County] before he took care of that."

At approximately 6:00 p.m., the Defendant drove to the Maxi Muffler shop where he visited with Clinton Daniel Mason, whom he had known for three or four years and saw as often as two or three times a week. While there, the Defendant asked Mason to return his .22 caliber rifle, which had been stored at Mason's residence, explaining that he had to "take care of some business in Scott County." Mason traveled to his mother's residence, where he obtained the weapon for the Defendant.

Vella Strunk, the sister of Stanley Goodman, lived in Scott County near the Goodman home. On Saturday nights, Ms. Strunk and her family regularly attended the races in Scott County and were typically joined by E.G. Because races usually lasted into the early morning hours, E.G. most often returned to her family residence at 2:00 or 2:30 a.m. According to Ms. Strunk, the Defendant knew that E.G. routinely attended the races and that the

---

[2] In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."

Goodmans would leave their door unlocked for her. On the night of May 20, E.G. joined the Strunk family for an evening at the racetrack. Because of rainy weather, however, they returned to the Strunk residence. At 8:30 p.m., Ms. Strunk called Mr. Goodman to let him know that E.G. planned to stay for a while. Although E.G. recalled being returned to the Goodman residence as early as 9:30 or 10:00 p.m., Ms. Strunk estimated the time to be 11:00 p.m. She testified that no lights were on at that time. Because Ms. Strunk had asked to borrow a bag of coffee, she did not leave until E.G. returned with the coffee. E.G. did not see the Goodmans before going to bed. Shortly before noon on the following day, Ms. Strunk called the Goodman residence but got no answer. About ten minutes later, E.G. telephoned Ms. Strunk, tearfully informing her that her father and stepmother were still in bed and had blood on them. Ms. Strunk drove to the residence, discovered the bodies of Mr. and Ms. Goodman, and contacted the police.

At approximately 3:30 a.m. on Sunday, May 21, several hours before the bodies were discovered, Mason drove to the Defendant's residence. At trial, Mason recalled that Ms. Sexton appeared to be upset and that the Defendant appeared to be "drunk or something." At 8:30 on the same morning, the Defendant drove to Mason's residence and took Mason and his girlfriend to a Denny's Restaurant for breakfast. When the Defendant admitted to Mason that he had killed Mr. Goodman, Mason stopped him from providing any of the details. The Defendant later acquired two tires for his 1989 Oldsmobile at Mason's place of employment.

Between 8:00 and 9:00 a.m. on Monday, May 22, the Defendant and Ms. Sexton visited Adams and his girlfriend at their room at a Budget Inn. While Ms. Sexton talked with Adams's girlfriend, the Defendant admitted to Adams that he killed the Goodmans as they slept in their bedroom, explaining that he had bought a hood, sweats, and gloves at a Dollar Store and, after "dispos[ing] of all hair follicles off of his body," had shot the Goodmans in their bedroom, burned his own clothes and the stock of his rifle, and buried what remained of the rifle. The Defendant informed Adams that he had purchased oversized shoes so that it would appear that someone else had committed the crimes. He also informed him that he had changed the tires on his vehicle.

On Sunday, May 21, shortly after the discovery of the bodies of the Goodmans, Detective Alvarez received a telephone call informing him of the crimes and of the involvement of the Tennessee Bureau of Investigation ("TBI"). Later in the day, he spoke with the Sextons. Three days later, on May 24, Detective Alvarez learned that Sherry Sexton had tried to reach him by telephone. He recorded his return call to Ms. Sexton, whom he described as sounding desperate, and arranged a meeting with her at the south precinct. At 11:00 p.m. on the same night, Detective Alvarez and TBI Special Agent Barry Brakebill met with Ms. Sexton, who was apparently prepared to make a statement. About thirty minutes later, the Defendant arrived, insisting that he be allowed to talk with Ms. Sexton and

attempting to force his way into the interview room. Detective Alvarez left the room to confront the Defendant, who claimed that Ms. Sexton was upset and did not know what she was talking about. In the meantime, Agent Brakebill moved Ms. Sexton to another location in order to complete the interview and, afterward, transported her to a safehouse in McMinn County. The Defendant was arrested for the murders on the following day.

TBI Agent Charles Scott, who searched the Defendant's residence after obtaining consent, found a .22 caliber rifle, which was inoperable because there was no trigger assembly. Although not the weapon the Defendant acquired from Mason or submitted as the weapon used in the murders, the trial court admitted the rifle as an exhibit. Agent Scott also testified that it would take between two and two and one-half hours to travel the 125 miles from Huntsville in Scott County to Bradley County by interstate. He stated that an alternate route through Harriman could involve even less travel time.

During the course of the murder investigations, it was determined that Christy Swallows, who resided in the same trailer park as the Sextons and had babysat for the children living in their home, had been involved in an affair with the Defendant. At trial, she stated that the Defendant had informed her about the child sex abuse allegations on or about May 14, and that he blamed "[t]hat bastard in Scott County" for his predicament, declaring that "he would kill him for this." On the day after the murders, the Defendant came to her residence and beat on her doors and windows to awaken her. She described the Defendant as "frantic" and "in a panic." He informed her that his wife had left him and her car was at the police station. When Ms. Swallows asked the Defendant whether he had committed the crimes, he initially said "no," but ultimately admitted to committing both murders, "blow[ing] them son of a bitches full of holes." He explained that he had acquired the gun from "Danny." Ms. Swallows reported this information to Agents Brakebill and Scott on May 25.[3]

During trial, the transcribed preliminary hearing testimony of Tinnie Chumley, an employee at the Dollar Store in Cleveland, was presented as evidence. She reported that on Saturday, May 20, she sold a black sweatshirt and black sweat pants to a white male. Ms. Chumley was unable to identify the Defendant from a photographic lineup. TBI Agent David Guy, who interviewed Ms. Chumley, presented a cash register journal that established 2:37 p.m. as the time of a purchase in the amount of $10.83 for a fleece shirt and pants. Payment was with a twenty dollar bill. On May 21, the same day the bodies were discovered, officers found a Dollar Store receipt for a fleece shirt and pants in the same amount in the

---

[3] In a jury out hearing during Ms. Swallows' testimony, she stated that the Defendant admitted that he "made [B.G.] suck his dick." After concluding that the prejudice outweighed the probative value, the trial court excluded the statement.

Defendant's car. The receipt confirmed that the purchase was made in cash.

Shera Crowley, who had prepared the Defendant's tax return early in 2000, testified that when she pointed out that he had omitted his own daughter, B.S., as a dependant, but added E.G., the daughter living with the Goodmans, the Defendant remarked, "If the son of a bitch ever tried to claim her or take her, he would blow his . . . brains out." Ms. Crowley testified that she later warned Ms. Goodman of the threat, but that Ms. Goodman did not appear to be concerned.

Detective Wade Chambers of the Scott County Sheriff's Department investigated the crime scene. He found no weapons, fingerprints, tire prints, or signs of forced entry at the Goodman residence. Initially, he discovered six shell casings in the residence. Later, after receiving the autopsy report, he returned to the scene and discovered three more shell casings, explaining that the casings were difficult to find during his first visit because of sawdust on the floor. Dinah Culag, a TBI Forensic Scientist, determined that all the shell casings had been fired from the same firearm. Although she could not identify the type of weapon, it was her opinion that a semi-automatic was used, rather than a revolver, because cartridge casings from a revolver had to be manually ejected.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsies at the University of Tennessee Medical Center. She determined that Mr. Goodman had been shot four times, "all in the right facial region." One of the four shots "totally destroyed the right eye" and another severed his spinal cord. A fifth shot wounded his right arm. Dr. Elkins concluded that Ms. Goodman also died from multiple gunshot wounds, three to her face and one in front of her right ear, causing "massive skull fractures and extensive damage to the brain." The seven fragments taken from the two bodies were consistent with a .22 bullet. Because one of the shots passed through Mr. Goodman's body and another passed through that of Ms. Goodman, Dr. Elkins was unable to examine those bullets.

Randall Boston, a law student working for defense counsel, was the only witness appearing on behalf of the Defendant. He testified that he had traveled by interstate from the muffler shop in Cleveland to Athens and by State Routes 58, 70, 29, and 27 to the Goodman residence in Huntsville, a distance of 126.8 miles, and that the travel time was two and one-half hours driving at or less than the speed limit. On cross-examination by the State, which attempted to establish that the distance could be driven in less time, Boston answered "no" when asked whether he was aware that the Defendant had been charged with driving ninety-seven miles per hour along the same route two days after the murders.

After a short period of deliberation, the jury returned verdicts of guilt on each of the two counts of first degree murder.

**Penalty Phase of the Trial**

During the penalty phase of the trial, the State offered victim impact evidence from Lamance Bryant—the brother of Ms. Goodman and a school teacher in Scott County—E.G., and Ms. Strunk, the sister of Mr. Goodman. Bryant, who described Ms. Goodman as "a very friendly, outgoing person," with "a sweet spirit," testified that she was also survived by her mother, Magdalene Lawson, and two sisters, Sharon Jeffers and Jaretta Claxton. He recalled that Ms. Goodman had been seriously injured in a 1985 automobile accident, which had resulted in a complete inability to work. He stated that she had endured several months of physical therapy and years in a wheelchair and later had to use a walker. He stated that she had to re-learn to talk as a result of the accident and had been able to walk on her own for a period of only six to eight months prior to her murder. Bryant described her death as particularly devastating to their mother.

E.G., who testified that she was particularly close to her father, stated that she had a good relationship with her step-mother, Ms. Goodman. Since the murders, she had experienced nightmares, feared being alone, and partially blamed herself because the door at her residence had been left open for her return from the races. When asked where her home was at the time of the trial, she answered, "I really don't feel like I have one."

Ms. Strunk confirmed that E.G. had experienced nightmares, did not sleep well, and was afraid to be by herself. Because of Ms. Strunk's close relationship with her brother, she believed that her own life would "never be like it was before."

In an effort to establish mitigating circumstances as to punishment, the Defendant called three witnesses: Lynn Sexton, the wife of the Defendant's first cousin; Karen Cooper, who had known the Defendant since he was three or four years old; and Dr. William D. Kenner, a physician with specialized training in psychiatry, child psychiatry, and psychoanalysis.

Lynn Sexton, who is also a first cousin to Sherry Sexton, testified that the Defendant, Ms. Sexton, and their three children lived with her for approximately six months before they moved first to a trailer park in Scott County and later to a trailer park in Bradley County. Lynn Sexton recalled that during the six months that the Defendant lived at her home, he did not cause any difficulty with any member of her family, including her thirteen-year-old son and sixteen-year-old daughter. She stated that the Defendant worked everyday, did not drink to excess, and did not use illegal drugs. She testified that she often left her daughter and son in the care of the Defendant at her residence.

Karen Cooper remembered that the Defendant's parents were divorced when he was six and, thereafter, that he did not live with either parent. Recalling that he had once stepped

off of a school bus only to find that his residential family had moved, she estimated that the Defendant had lived with between six and eight families before age eighteen and that no one other than her sister-in-law kept him for more than just a few months. Ms. Cooper stated that the Defendant's mother rarely communicated with him and that his father, who was in poor health and living in Dalton, Georgia, only saw him slightly more than his mother.

Dr. Kenner, formerly a member of the faculty in adult psychiatry at Vanderbilt University and in private practice since the mid-1970s, examined the Defendant in preparation for the trial. During the course of his examination, he learned that the Defendant had lived in twenty-six different residences before he reached the age of eighteen and that he was of average intelligence, but that he did not stay long enough in any place to develop friendships or role models, such as older relatives, teachers, or ministers. Dr. Kenner reported that the Defendant's father had spent six months in an Army psychiatric hospital and later developed heart disease and chronic lung disease, which prevented him from keeping his family together after the Defendant's mother left his father for another man and took the Defendant's younger brother with her. Dr. Kenner described the Defendant as traumatized by the loss and as having suffered from significant emotional deprivation during his youth because of the lack of a consistent caretaker. Dr. Kenner explained that the Defendant felt particularly vulnerable after the sex abuse allegations because of his fear of losing the children in his residence, particularly his daughter B.S. It was Dr. Kenner's view that the Defendant had the capacity to "actually do better in prison . . . because one of the things that prison provides is, it's like family . . . contained . . . consistent." He further testified that if the Defendant "lives and spends the rest of his life in prison, then at least his children will not feel as though they are responsible for his execution." On cross-examination by the State, Dr. Kenner acknowledged that the Defendant was not insane, in that he knew of his wrongful acts, but he described the Defendant as having a personality disorder, which qualified as a mental disease or defect.

After the final argument by counsel and the instructions by the trial court, the jury imposed the death penalty for each of the two first degree murder convictions. The jury concluded that the State had established beyond a reasonable doubt that each of the murders "was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," the applicable statutory aggravating circumstance. Tenn. Code Ann. § 39-13-204(i)(6).

## Appeal

The Defendant filed a motion for new trial on July 30, 2001, and was permitted to file amendments, first on November 23, 2004, and later on November 1, 2007. The trial court

denied relief on January 24, 2008.[4] The notice of appeal was filed on February 8, 2008. Briefing was not completed for first-tier review until May 28, 2009. After argument, the Court of Criminal Appeals affirmed the two convictions for first degree murder and the sentences of death on each count.[5] State v. Sexton, No. E2008-00292-CCA-R3-DD, 2010 WL 5054428, at *38 (Tenn. Crim. App. Dec. 7, 2010). The appeal to this Court is directed by statute:

> The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee [S]upreme [C]ourt. Upon the affirmance by the [C]ourt of [C]riminal [A]ppeals, the clerk shall docket the case in the [S]upreme [C]ourt and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure.

Tenn. Code Ann. § 39-13-206(a)(1) (1997).

In this appeal, the Defendant first argues that the trial court erred by failing to change the venue of the trial from Scott County. Secondly, he claims that the trial court committed error during the process of jury selection (a) by failing to provide prospective jurors with appropriate admonitions during the selection process; (b) by failing to permit the Defendant the opportunity to rehabilitate prospective jurors who had indicated by their responses in jury questionnaires that they could not vote for the death penalty; (c) by failing to adequately voir dire jurors as to the extent of their knowledge about the crimes acquired from local newspaper reports; and (d) by failing to excuse certain of the jurors for cause. Thirdly, in addition to challenging the sufficiency of the evidence, the Defendant contends that the trial court committed several errors on evidentiary issues (a) by permitting certain portions of the

---

[4] Trial counsel for the Defendant, Larry Warner, filed the initial motion for new trial. The November 23, 2004 amended motion for new trial was filed by new counsel, William P. Redick, Jr., and Peter D. Heil. Defendant's current appellate counsel, James A. Simmons and Richard L. Gaines, filed the final amended motion for new trial on November 1, 2007. The Defendant also made three pro se filings on April 15, 2002, titled: "Amended Motion for New Trial to Incorporate the Element of Fraud Upon the Court by the Prosecution in This Case"; "Amended Motion for New Trial to Incorporate Petitioner's Rights to File Pro Se Pleadings"; and "Amended Motion for New Trial to Incorporate a Claim of Ineffective Assistance of My Trial Attorneys."

[5] The opinion of the Court of Criminal Appeals was filed on December 7, 2010. The Defendant claims that in March of 2011, he discovered "new evidence" of interaction between jurors and outside sources during the course of the trial. Thereafter, the Defendant filed a petition for writ of error coram nobis in the trial court, seeking a new trial on the basis of the newly discovered evidence. The Defendant then sought a stay in this Court, pending the outcome of the petition. On July 27, 2011, this Court denied the motion. State v. Sexton, No. E2008-00292-SC-DDT-DD (Tenn. July 27, 2011 Order).

testimony by DCS employee Hope Tharp, specifically her recollection of the details of the child sex abuse allegations; (b) by allowing references to a polygraph examination by Officers Millsaps and Alvarez; (c) by admitting into evidence a .22 caliber rifle found in the Defendant's residence, which was admittedly not the murder weapon; (d) by admitting into evidence the Dollar Store receipt found in the Defendant's automobile; (e) by allowing references to the conduct of Sherry Sexton, who did not testify at trial; (f) by admitting testimony of Shera Crowley, who implied wrongdoing on the part of the Defendant in regard to his income tax return; and (g) by allowing testimony that the Defendant had been stopped by police two days after the murders for driving ninety-seven miles per hour. Fourthly, the Defendant argues that he is entitled to a new trial as to both the guilt and sentencing phases because of multiple instances of prosecutorial misconduct. Next, the Defendant mounts a series of challenges to the constitutionality of our capital sentencing scheme. As to the penalty phase of the trial, the Defendant argues that the evidence of the aggravating circumstance was insufficient to justify the imposition of the death penalty on either of the two convictions. Finally, the Defendant argues that the cumulative effect of the errors warrants a new trial.[6]

---

[6] Pursuant to Tennessee Supreme Court Rule 12.2, after the briefs were filed, this Court expressed particular interest in the following issues:

1. Whether, in light of the requirement of State v. Jordan, 325 S.W.3d 1, 72 (Tenn. 2010), that there be "particular proof" that avoiding arrest or prosecution was one of the motives for the murder, the evidence is sufficient to support aggravating circumstance (i)(6), that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another.

2. Whether the trial court erred by admitting as relevant to the question of motive the testimony of DCS employee Hope Tharp as to the details of the allegations of sex abuse made against the defendant in a separate criminal charge.

3. Whether the trial court erred by failing to insure adequate voir dire of the jurors regarding their access to extrajudicial information/pretrial publicity.

4. Whether the trial court erred by failing to allow the defendant to rehabilitate jurors who were excused for cause based solely on their answers to the juror questionnaire. Regarding this issue, the defendant and the State should be prepared to

> (a) specifically discuss those jurisdictions that approve or disapprove of the practice of excusing jurors based solely on their answers to jury questionnaires and absent any opportunity for voir dire;

> (b) recommend which of the policies the Court should adopt; and

(continued...)

## I. Venue

Prior to trial, the Defendant filed a motion requesting a change of venue on grounds that Scott County newspaper reports, among other things, identified the Defendant as the primary suspect, included information about the custody dispute, made reference to the child sex abuse allegations, and speculated on the possibility of a polygraph examination. He also claimed that many of the prospective jurors knew the victims, were related to the family of the victims, or were employees of the Scott County Sheriff's Department or District Attorney General's Office. The Defendant further contended that the trial court was predisposed to maintain venue in Scott County as evidenced by the following comment made by the trial court judge: "I will see to it that we will have a trial in this county." In response, the State pointed out that both newspaper articles cited by the Defendant had been published over a year before the trial and that there was no indication that any jurors who sat on the panel had been prejudiced by pretrial publicity.

As to the prospective jurors who knew the Goodmans or were employed by the Sheriff's Department or the District Attorney General's Office, the State points out that one, after indicating that he could not be fair, was excused for cause, while the others expressed confidence that their relationships would not affect their decision as jurors. The State further asserts that the Defendant did not challenge the two jurors who were acquainted with either the Goodmans, the Sheriff's Department, or the District Attorney General's Office.

Whether to grant a motion for change of venue rests within the discretion of the trial

---

[6](...continued)

> (c) suggest the appropriate remedy in the event the trial court committed error in this case.

In reference to this issue, the Court observes that several of the juror questionnaires have not been included in the record. The defendant is directed to supplement the appellate record with all of the jury questionnaires at issue. See Tenn. R. App. P. 24(e).

5. Whether the trial court erred by allowing the admission of testimony regarding the defendant's initial agreement and later refusal to take a polygraph test in the child sex abuse case.

6. Whether the trial court erred by allowing the admission of testimony and arguments regarding out-of-court statements made by the defendant to his spouse, Sherry Sexton.

7. Whether admission of the specific facts of the sex abuse allegations against the defendant during the guilt phase, if erroneous, qualified as harmless regarding the imposition of the death penalty.

State v. Sexton, No. E2008-00292-SC-DDT-DD (Tenn. Nov. 16, 2011 Order).

court. State v. Rogers, 188 S.W.3d 593, 621 (Tenn. 2006) (appendix). A change of venue should be granted, however, when "a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). In Rogers, this Court identified the criteria governing whether a change of venue is in order: the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire persons' familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations, or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay, or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury. Rogers, 188 S.W.3d at 621-22 (appendix) (citing State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979)).

Further, in order to obtain relief on a claim that the trial court improperly denied a motion for a change of venue, a "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." Rogers, 188 S.W.3d at 622 (appendix) (citing State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992)). "The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue." Rogers, 188 S.W.3d at 621 (appendix) (citing State v. Mann, 959 S.W.2d 503, 531-32 (Tenn. 1997)). "[P]rejudice will not be presumed on the mere showing of extensive pretrial publicity." Rogers, 188 S.W.3d at 621 (appendix) (citing State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982)); see also State v. Thacker, 164 S.W.3d 208, 238 (Tenn. 2005) (appendix) ("One who is reasonably suspected of murder cannot expect to remain anonymous."); State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989).

Here, the Court of Criminal Appeals carefully examined the content of the June 1, 2000 edition of the Independent Herald, which reported that the Defendant had been identified as the primary suspect as a result of interviews with family members; that the victims had sustained multiple .22 caliber gunshot wounds to the face; that Mr. Goodman had made allegations of child abuse in order to gain custody of the children from the Defendant; that Mr. Goodman had planned to travel to Cleveland to seek custody of his two other children on the Monday following the murders; and that the Defendant, who had stated that he was going to Scott County to take care of the problem, had reportedly admitted to Ms. Sexton that he had committed the murders and that she was cooperating in the investigation.

Following the preliminary hearing, the Scott County News reported that the Defendant had been bound over to the Grand Jury for the two murders. The report included references to certain testimony given in the proceeding: that Ms. Sexton and one of the Defendant's friends stated that the Defendant admitted that he had gone to Scott County and killed the Goodmans; that Ms. Tharp had testified to the details of B.G.'s child sex abuse complaint against the Defendant; that Officer Millsaps had overheard a conversation regarding a possible polygraph examination; and that Mason had testified that both the Defendant and Ms. Sexton had informed him that the Defendant had committed the murders.

Five of the prospective jurors, two of whom actually served on the jury, conceded that they had some information about the crimes. As indicated, Gerald Lewis, who knew Ms. Goodman through his relationship with her brother, Lamance Bryant, acknowledged that he could not be fair and was excused for cause. Jeanna Jeffers described herself as being acquainted with the Scott County Sheriff, Ms. Goodman, and Mr. Goodman's sister, Sharon Lawson. She also acknowledged that one of the Defendant's attorneys had previously represented her son in an unrelated matter. Ms. Jeffers, who served as a juror, offered assurances that her acquaintanceship with these individuals would not affect her ability to be fair and impartial. Linda Underwood, who also knew the sheriff, explained that their relationship would not affect her fairness as a juror. As a result of a peremptory challenge, however, she was excused from service. Thelma Kidd, who knew the sheriff and who attended school with the district attorney, stated that her acquaintanceships would not prevent her from being fair. She was permitted to serve on the jury. Craig Creech, who used to work with Mr. Goodman's step-brother, had a conversation with him in the hallway prior to the selection of the jury. After learning of the conversation, the trial court excused Mr. Creech for cause.

The record establishes that the Defendant chose not to challenge jurors Jeffers or Kidd, either peremptorily or for cause. While the record does indicate that these jurors either had knowledge of pretrial publicity or had some association with individuals involved in the case, they professed the ability to perform their duties as directed by the trial court. "[T]he mere exposure of jurors to newspaper publicity is not constitutional error." Lackey v. State, 578 S.W.2d 101, 103 (Tenn. Crim. App. 1978) (citing Murphy v. Florida, 421 U.S. 794, 798 (1975)). The available jury questionnaires and the transcript of the voir dire contain no indication that the pretrial publicity or the two jurors' acquaintanceships with the sheriff, the district attorney general, or members of the victims' family adversely impacted the jury panel. In consequence, the trial court did not abuse its discretionary authority by refusing to change the venue of the trial.

## II. Jury Issues
### A. Jury Admonishment

-14-

After making a general reference to article I, section 9 of the Tennessee Constitution and the Sixth Amendment to the United States Constitution, which guarantee the right to an impartial jury, the Defendant asserts that the trial court failed to properly warn the prospective jurors not to discuss this case with each other and with other citizens attending the trial. The Defendant, however, neither cites to any point in the record nor identifies any communications or extra-judicial material that tainted the jury's process. See Tenn. R. App. P. 27(a)(7)(A) (requiring the appellant's brief to contain "appropriate references to the record . . . relied on").

Tennessee Rule of Criminal Procedure 24(g) does require courts to "give the prospective jurors appropriate admonitions regarding their conduct during the selection process . . . [and] during the case."[7] The record before us indicates that after the prospective jurors were sworn, the trial court dispensed questionnaires seeking assurances that the jurors would "avoid any outside influence on this case." During voir dire, the trial court provided defense counsel with the opportunity to ask the prospective jurors about any personal knowledge of the crimes and any exposure to outside materials. No further inquiry was made by the counsel for the Defendant.

---

[7] The rule provides as follows:

The court shall give the prospective jurors appropriate admonitions regarding their conduct during the selection process. After jurors are sworn, the court shall also give them appropriate admonitions regarding their conduct during the case. In both situations these shall include admonitions:

(1) not to communicate with other jurors or anyone else regarding any subject connected with the trial;

(2) not to form or express any opinion about the case until it is finally submitted to the jury;

(3) to report promptly to the court:

(A) any incident involving an attempt by any person improperly to influence any jury member; or

(B) a juror's violation of any of the court's admonitions;

(4) not to read, hear, or view any news reports concerning the case; and

(5) to decide the case solely on the evidence introduced in the trial.

Tenn. R. Crim. P. 24(g).

Under these circumstances, we cannot find error. Absent any evidence in the record that the trial court's admonishment of the jury was lacking or that individual jurors were prejudiced by exposure to extra-judicial influences, the Defendant is not entitled to relief.

### B. Striking Jurors Based on Questionnaire Responses

Both the State and counsel for the Defendant were afforded the opportunity to submit questions to include in the questionnaire that prospective jurors were required to complete as part of the voir dire process. In the questionnaire, jurors were asked to "circle one of the following that best reflects your feeling about the death penalty[:] 1. Automatically vote for the death penalty[;] 2. Strongly favor the death penalty[;] 3. Neither favor nor oppose the death penalty[;] 4. Strongly oppose the death penalty[;] 5. Never vote for the death penalty[; or] 6. None of the above[.] If number 6, please explain[.]" After receiving the responses, the trial court, without considering all of the answers on each prospective juror's questionnaire, excused the eighteen prospective jurors who selected either choice 1, indicating that they would automatically vote for the death penalty, or choice 5, indicating that they would never vote for the death penalty.

In this appeal, the Defendant contends that the "refusal to allow attorney questioning of these . . . jurors violated the [Defendant's] rights under Tenn. Const. Art. I §§ 8, 9, 16, 17; Art. XI § 8; U.S. Const. Amends. V, VI, VII, and XIV." In response, the State first contends that the claim was waived based on the Defendant's failure to explain either the basis of his initial objection or the nature of the constitutional violation. The State nonetheless addresses the merits of the Defendant's claim, arguing that because the trial court's questionnaire identified those prospective jurors who could not consider all possible forms of punishment, their exclusion was not erroneous. The Court of Criminal Appeals did not consider this issue.

Initially, the State and counsel for the Defendant had some participation in the preparation of the questions contained in the jury questionnaire. During a pretrial hearing regarding a defense motion challenging the procedure for striking jurors because of their opposition to the death penalty, the trial court made the following announcement regarding the questionnaire that would be distributed to prospective jurors:

> Just for the record, . . . I'm going to insert . . . question [33] on my own, and my idea is anyone who essentially cannot follow the instruction, who will always impose the death penalty in such a case or who will never impose the death penalty in a specific case, they will be excluded for cause. Okay, that's the Court's promise.

Responding to the trial court's stated intention of striking jurors who responded that they

would either "always" or "never" impose the death penalty, defense counsel stated, "Well, I'm objecting—for the record's sake." Later, upon receiving the prospective jurors' questionnaires, the trial court made reference to the prospective jurors who had indicated that they would either "automatically" vote for the death penalty or "never" vote for the death penalty: "I'm going to excuse the ones that have been challenged because they are not death qualified. I think we all know the criteria that the Court was using, and you may want to place an objection on the record as to that." Defense counsel responded, "We have an objection we'll not argue, your honor."

The failure "to take whatever action was available to prevent or nullify the harmful effect of an error" may result in a waiver of the issue on appeal. Tenn. R. App. P. 36(a); see also State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993). Under these circumstances, however, the issue cannot be considered as waived. Moreover, because another jury will be empaneled on the remand to the trial court for sentencing, this Court has chosen to provide guidance on the issue.

Initially, both the United States Constitution and the Tennessee Constitution, as indicated, guarantee defendants the right to an impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; see also Morgan v. Illinois, 504 U.S. 719, 729-30 (1992) (explaining that the trial judge must ensure that the jurors follow their instructions and fairly evaluate the evidence). All defendants are entitled to a trial by a jury free of "bias or partiality toward one side or the other of the litigation." State v. Schmeiderer, 319 S.W.3d 607, 624 (Tenn. 2010) (appendix). To achieve this goal of fair and impartial juries, voir dire permits questioning by the court and counsel so that certain potential jurors can be properly challenged and stricken. See State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993). Trial courts are vested with considerable discretion in conducting the voir dire process. Schmeiderer, 319 S.W.3d at 625 (appendix); State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). Rule of Criminal Procedure 24(b) and (c), which governs voir dire, provides, in pertinent part, as follows:

(b) Questioning Potential Jurors.

(1) Questioning Jurors by Court and Counsel. The court may ask potential jurors appropriate questions regarding their qualifications to serve as jurors in the case. It shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges.

(2) Questioning Outside Presence of Other Jurors. On motion of a party or its own initiative, the court may direct that any portion of the questioning of a

prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors.

(c) Challenges for Cause.
(1) Procedures. After examination of any juror, the judge shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause. After the court has tentatively determined that the jury meets the prescribed qualifications, counsel may conduct further examination and, alternately, may exercise challenges for cause.

Tenn. R. Crim. P. 24. This Court has interpreted the rule to give the "trial judge the right to excuse a juror for cause without examination of counsel." State v. Hutchison, 898 S.W.2d 161, 167 (Tenn. 1994). In reviewing the trial court's disqualification of a potential juror, the standard historically applied has been that the trial court's decision must be upheld on appeal absent a clear abuse of discretion. Schmeiderer, 319 S.W.3d at 625 (appendix); State v. Raspberry, 875 S.W.2d 678, 681 (Tenn. Crim. App. 1993).

In capital cases, potential jurors may not be excluded simply because they express "general objections to the death penalty" or express reservations in its application. Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). Exclusion is proper only when potential jurors' views will "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths." Wainwright v. Witt, 469 U.S. 412, 424 n.5 (1985). As such, "the extremes must be eliminated—i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or [those who would] automatically vote to acquit or impose a life sentence." Morgan, 504 U.S. at 734 n.7 (quoting Smith v. Balkcom, 660 F.2d 573, 578 (5th Cir. 1981)) (internal quotation marks omitted).

While addressing juror responses to oral questions, rather than a written questionnaire, this Court has considered the issue of whether a potential juror with a declared opposition to the death penalty could be excused by the trial court absent any opportunity being afforded the Defendant to rehabilitate the juror. See State v. Austin, 87 S.W.3d 447, 472-73 (Tenn. 2002). This Court employed the Wainwright standard in Austin—"whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," Wainwright, 469 U.S. at 424—and upheld the trial court's dismissal of a juror because the juror's answers left "'no leeway for rehabilitation.'" Austin, 87 S.W.3d at 472-73 (quoting State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981)). This Court adopted the Court of Criminal Appeals' view that a juror's bias regarding the death penalty need not be proved with "unmistakable clarity," but that the trial judge must have the "definite impression" that the potential juror is incapable of following the law. Austin, 87

S.W.3d at 473. The stated scope of review was that a trial court's finding of juror bias based on views of the death penalty is accorded a presumption of correctness that will not be overturned absent "convincing evidence" that the ruling was erroneous. Id. While numerous opinions from this Court have recited and relied on this standard, our research reveals no cases where this Court has reviewed a trial court's decision to strike prospective jurors based solely on a single response to a questionnaire. See, e.g., State v. Reid, 213 S.W.3d 792, 835-36 (Tenn. 2006) (appendix) (where, in addition to multiple questionnaire responses, the trial court reviewed the prospective juror's oral responses to voir dire questioning); Rogers, 188 S.W.3d at 624-25 (appendix) (where the trial court individually questioned prospective jurors to follow up on their questionnaire responses); State v. Berry, 141 S.W.3d 549, 579-82 (Tenn. 2004) (appendix) (where the trial court sought clarification of the prospective jurors' questionnaire responses).

The Defendant relies, in part, on two California cases, People v. Stewart, 93 P.3d 271, 286-87, 289-90 (Cal. 2004) and People v. Wilson, 187 P.3d 1041, 1054-55 (Cal. 2008), for the proposition that "it is unconstitutional . . . to excuse for cause prospective jurors based solely on written answers provided in [j]ury [q]uestionnaires." In both cases, jurors were excluded based solely upon answers to written questionnaires. The California Supreme Court conducted de novo reviews. In Stewart, the court held that excluding a prospective juror based solely on a written questionnaire is not per se unconstitutional, but did observe that based on the wording of the questionnaire and the jurors' answers to the questionnaire, it was not clear that they would be unable to faithfully carry out their duty as jurors. Stewart, 93 P.3d at 289-90. In Wilson, the court applied the rule established in Stewart, but upheld the trial court's exclusion of prospective jurors based on their overall responses to the jury questionnaire, commenting that the jurors' responses to one specific question made it "sufficiently clear" that they could not fulfill their duties as impartial jurors. Wilson, 187 P.3d at 1061.

The State cites People v. McKinnon, 259 P.3d 1186, 1219-20 (Cal. 2011), as support for its argument that striking prospective jurors because of their responses to a written questionnaire is proper. When potential jurors in McKinnon indicated by their responses to several written questions that they would always vote in a certain manner and defense counsel declined an offer for further examination, the court ruled that removal is proper if there is "sufficient information . . . to permit a reliable determination that the juror's death penalty views would prevent or substantially impair the performance of his or her duties." Id. at 1219 (internal quotation marks omitted); see also People v. Avila, 133 P.3d 1076, 1105 (Cal. 2006) (upholding trial court's disqualification of jurors based on answers to a written questionnaire where several questions enabled the trial court to identify potential jurors' views "so strong as to disqualify them for duty on a death penalty case"). When determining the propriety of striking prospective jurors based on responses to a questionnaire, the focus

-19-

in California appears to be on the substance and sufficiency of the questions and the unequivocal nature of the responses.

Our view is that the exclusion of prospective jurors based solely upon the response options to Question 33, as phrased in the questionnaire, is not permissible. First, neither of the options is tethered to the circumstances of the case. For example, a juror's choice of the first response option—"Automatically vote for the death penalty"—could mean that the juror would automatically vote for the death penalty if the State proved that the defendant had committed a capital offense and that the aggravating factors outweighed the mitigating factors; but it could also mean that the juror would automatically vote to impose the death penalty even if the State did not prove its case. Similarly, a juror's choice of the fifth response—"Never vote for the death penalty"—could mean that the juror would not impose the death penalty even if the State proved beyond a reasonable doubt that the defendant had committed a capital offense and that the aggravating factors outweighed the mitigating factors. In order to have predictive value as to whether the prospective juror's responses represent more than a general objection to or general predisposition for the implementation of the death penalty, see Witherspoon, 391 U.S. at 522, questions such as these should be honed to a finer point. Prior to disqualification of a prospective juror, the trial court should develop a process designed to definitively ascertain whether the juror is predisposed to a certain result regardless of the law. Austin, 87 S.W.3d at 473; see Hutchison, 898 S.W.2d at 167 (jurors insisting that they are unable to impose the death penalty regardless of the law are disqualified).

A second concern is the manner in which the trial court used the answers to Question 33. From all appearances, the trial court excluded the prospective jurors based solely upon their answer to Question 33 without considering the jurors' answers to any of the other questions. In our assessment, trial courts must consider in context all of the answers on a prospective juror's questionnaire rather than an isolated response. To illustrate, in State v. Anderson, 4 P.3d 369, 373-74 (Ariz. 2000), the Arizona Supreme Court, addressing a procedural rule in that state, held that the trial court erred when it excused prospective jurors based on their answers to a written questionnaire over defense counsel's objection and request for oral voir dire. In that case, the court pointed out that the answers, taken together, did not illustrate a "final and unequivocal" position regarding the death penalty. Id. at 374.[8]

---

[8] Contrary to the view adopted in California, the Arizona Supreme Court ruled that the procedural error affected the composition of the jury, requiring the guilty verdict to be set aside even when the evidence was overwhelming. Anderson, 4 P.3d at 377-79. But see Gray v. Mississippi, 481 U.S. 648, 667-68 (1987) (overturning death sentence but not disturbing guilty conviction); see also People v. Tate, 234 P.3d 428, 458 (Cal. 2010) (holding that "an error of [improperly striking a juror based on a questionnaire] does not require reversal of the guilt phase verdict"); Stewart, 93 P.3d at 292 (stating that this type of error "does not require
(continued...)

In this instance, further questioning may have afforded either the State or the defense an opportunity for rehabilitation. Only a definitive answer that the prospective juror would either always vote for the death penalty or never vote for the death penalty regardless of the instructions of the trial court is the kind of predisposition which might "prevent or substantially impair the performance of [their] duties" as jurors and result in disqualification. Wainwright, 469 U.S. at 424.

The jury questionnaire used in this case contains at least nine questions in addition to Question 33 that touched upon the prospective jurors' view of the death penalty. For example, Question 5 asks whether the juror has any philosophical, religious, or moral feeling that would make it difficult or impossible to sit in judgment of another. Question 5(A) asks whether a juror is a member of a religious organization that has a stated position regarding the death penalty (and what that position is). Question 7 asks whether the juror belongs to any group or organization which is opposed to or in favor of the death penalty. Question 13(E) asks whether the juror has any feelings about the nature of the charges that would make it difficult or impossible to be fair and impartial. Question 29 asks whether the juror's attitudes on the criminal justice system are such that they would be leaning toward the prosecution or the defense before hearing both sides. Question 31 asks whether the juror can think of any reason why he or she cannot be impartial. Question 36 asks whether the juror, depending on all the facts and circumstances of the case and all the evidence presented, could consider as a realistic and practical possibility imposing the death penalty, life without parole, or a life sentence. Question 40 asks whether the juror believes the death penalty is imposed too often, too seldom, randomly, or about right. Question 41 asks the juror whether there is any other information not specifically requested in the questionnaire that the court should know regarding the juror's attitude about imposing the death penalty, life without parole, or life with parole. Finally, catch-all Question 42 asks whether there is anything else the juror believes should be brought to the trial court's attention.

Our review of a sampling of the prospective jurors' questionnaires reveals that some of their answers regarding the death penalty were inconsistent with their other responses. For example, Dorsey Mullins, in answer to Question 33, stated that he neither favored nor opposed the death penalty; however, in the answer lines for the sixth response – "None of the above" – he wrote that he did not believe in the death penalty. In response to Question 6, he wrote that he was a Baptist and that the church's stated position opposed the death penalty. In answer to Question 36(B), he stated that he could not consider the death penalty as a realistic and practical possibility. Finally, in answer to Question 40, Mr. Mullins stated

[8](...continued)
reversal of the guilt judgment"); People v. Heard, 75 P.3d 53, 66 (Cal. 2003) (holding that "such an error does not require reversal of the judgment of guilt").

that there should not be a death penalty.

Deborah Morrow answered Question 33 by stating that she could never impose the death penalty. Yet in answer to Question 36(B), she stated that she could consider imposing the death penalty as a realistic and practical possibility, but she added that "only God has the right to take a life." She also answered Question 5 by writing that she was against the death penalty but could certainly impose a sentence of life without parole.

Similarly, Michael Stephens answered Question 33 by stating that he would automatically vote for the death penalty. In answer to Question 36(B), however, he stated that he could not consider imposing the death penalty as a realistic and practical possibility. He also answered Questions 36(A) and 36(C) by stating that he could not consider life without parole or life imprisonment. In answer to Question 34 (a question that he should not have answered in light of his answer to Question 33), Mr. Stephens stated that it would not go against his nature to vote for life without parole or life imprisonment.

The answers provided by prospective jurors Mullins, Morrow, and Stephens, may have been a basis for disqualification. Nevertheless, their inconsistent answers suggest a level of uncertainty and highlight the risk that eliminating prospective jurors based solely on an answer to one written question may result in the exclusion of those who are entirely capable of rendering a proper verdict, and, if a defendant is found guilty in a capital case, imposing a sentence based on the law and the facts. Thus, trial courts must consider all of a juror's answers on a questionnaire, rather than giving just one answer dispositive weight, and should permit counsel to examine prospective jurors who provide inconsistent responses to pertinent questions.

In summary, those accused of crimes have a constitutional right to a trial by an impartial jury. State v. Odom, 336 S.W.3d 541, 556 (Tenn. 2011). By the same token, the State has an interest in having jurors who are able to impose capital punishment within the framework provided by law. Uttecht v. Brown, 551 U.S. 1, 9 (2007). Similarly, otherwise qualified jurors whose ability to impose the death penalty is not substantially impaired must not be arbitrarily prevented from serving on a jury in a capital case when called upon to do so. See Wolf v. Sundquist, 955 S.W.2d 626, 630 (Tenn. Ct. App. 1997). On remand, the composition and use of juror questionnaires must be consistent with these constitutional principles.

### C. Failing to Adequately Voir Dire Jurors

The Defendant next asserts that the trial court failed to adequately voir dire the jurors as to their pretrial exposure to extrajudicial information. In support of his argument, he names nine jurors who admitted to having been exposed to reports about the murders and

submits that the trial court erred by asking only one of these jurors about the substance of the information. The record indicates that none of those who actually served as jurors were challenged for cause.

As stated, the manner in which voir dire is conducted rests within the sound discretion of the trial court. Howell, 868 S.W.2d at 247. The goal of voir dire is to empanel a jury that is competent, unbiased, and impartial. State v. Hugueley, 185 S.W.3d 356, 390 (Tenn. 2006) (appendix); State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994); Howell, 868 S.W.2d at 247. A juror's prior knowledge about a case does not automatically result in constitutional error. Murphy, 421 U.S. at 799-800; Hugueley, 185 S.W.3d at 390 (appendix). The fundamental inquiry "in determining a juror's acceptability is whether his exposure is to matters . . . 'so prejudicial as to create a substantial risk that his or her judgment will be affected.'" Hugueley, 185 S.W.3d at 390 (appendix) (quoting Tenn. R. Crim. P. 24(c)(2)(B)). A trial court's determination as to the impartiality of a prospective juror can be overturned only if there has been an abuse of discretion. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). Appellate courts must uphold a trial court's ruling with respect to the impartiality of prospective jurors absent a finding of manifest error. Patton v. Yount, 467 U.S. 1025, 1031 (1984); Hugueley, 185 S.W.3d at 390 (appendix).

Rule 24(c)(1) of the Tennessee Rules of Criminal Procedure states that "[a]fter examination of any juror, the judge shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause." A prospective juror can also be challenged for cause if

> [t]he prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. The court shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind. A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Tenn. R. Crim. P. 24(c)(2)(B).

Because mere exposure to extrajudicial information does not automatically disqualify prospective jurors, trial courts must assess whether they can serve fairly and impartially given their knowledge of outside information. See Hugueley, 185 S.W.3d at 390 (appendix). In making this determination, the trial court must assess the level of potential prejudice arising from the extrajudicial information, as well as the believability of the juror's promise to remain impartial. See State v. Shepherd, 862 S.W.2d 557, 569 (Tenn. Crim. App. 1992). Given the wide-ranging availability of information in today's world, it is "quite likely jurors have some level of pre-trial exposure to the facts and issues involved in a case." Hugueley, 185 S.W.3d at 390 (appendix). In Irvin v. Dowd, 366 U.S. 717, 723 (1961), the United States Supreme Court observed that to

> hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

While the Defendant claims that the trial court should have further questioned the jurors to learn the substance and extent of their pretrial exposure to information about the murders, "such questions are not constitutionally required, and a trial court's failure to ask such questions is not reversible error unless the defendant's trial is thereby rendered fundamentally unfair." Cazes, 875 S.W.2d at 262. In this instance, counsel for the Defendant was permitted to individually voir dire the jurors about the source and nature of any information they may have seen, heard, or read. While several of the jurors acknowledged that they had some exposure to information appearing in the local newspaper, all promised to serve in an impartial manner and to heed the instructions of the trial court. The Defendant does not point to anything "so prejudicial as to create a substantial risk that [the jurors'] judgment [would] be affected." Hugueley, 185 S.W.3d at 390 (appendix). Nothing in the record suggests that the trial court abused its discretionary authority by not further questioning the jurors regarding their exposure to pretrial information. See Shepherd, 862 S.W.2d at 569 (explaining that it is up to the trial court to assess the believability of the jurors' assurances to serve impartially and follow the court's instructions). The Defendant is not entitled to relief on this issue.

### D. Failing to Excuse Jurors for Cause

The Defendant argues that the trial court violated his constitutional right to an impartial jury by failing to sua sponte excuse prospective jurors for cause. The Defendant contends that jurors Divine Crabtree, Jr. and Pamela Webb should have been disqualified for cause by the trial court and that prospective jurors Sharon Hughett, Loretta Terry, Judith Autry, Jimmy Chambers, Tina Sexton, Peggy Frogge, Sara Angela Jeffers, and Daniel

Murley should also have been excused for cause.

Juror Crabtree, while conceding that it would "be hard," testified that he could be fair and impartial and render a verdict without regard to what he had heard about the case. Juror Webb, after commenting that, if the Defendant was found guilty, she "would not consider any punishment that allowed parole," softened her stance after learning from the Defendant's counsel that fifty-one years of service on a life sentence was required before one was eligible. The prospective jurors who did not sit on the jury all expressed the ability to be fair and impartial despite any predispositions in regard to the imposition of the death penalty or their knowledge of newspaper reports. Of those, the Defendant did not challenge prospective jurors Hughett, Autry, Chambers, Sexton, or (Sara Angela) Jeffers. The Defendant did challenge prospective jurors Terry, Frogge, and Murley, but the trial court refused to strike any of the three for cause.

The trial court asked Ms. Frogge the following question: "Is it your position that when you say the punishment should fit the crime, if the crime is killing somebody, in your mind does that automatically mean the death penalty?" She replied, "Well, probably yes." When the trial court asked if she could follow the law regardless of her view, she answered, "I think so." Afterward, the defense counsel asked as follows: "If the proof in this case were that there was a premeditated killing of two people in their sleep, in their home, would you feel like that . . . would automatically engage the death penalty or would you still be able to consider other punishments?" Ms. Frogge replied, "[T]hat would probably warrant the death penalty . . . if it's premeditated." Sara Angela Jeffers, who indicated in her responses to the questionnaire that she strongly favored the death penalty, was asked the following question: "[D]o you feel like anytime somebody was convicted of taking another person[']s life that they should pay with their own life?" Ms. Jeffers answered, "Yes . . . [except for] some kind of mental problem." When the trial court intervened, asking Ms. Jeffers if she could consider all three possible punishments, she answered in the affirmative. Juror Murley, when filling out the questionnaire, indicated that he would tend to lean to the prosecution, but explained that his answer was based on what he had read in the newspapers about the crimes. He also stated that he strongly supported the death penalty in a response to the questionnaire explaining, "[T]hat's just my belief." Murley also stated that he believed more people ought to receive the death penalty. When challenged for cause, however, the trial court asked juror Murley if he would consider all three possible punishments. When Murley answered in the affirmative and assured the court that he would not automatically vote in any direction, the trial court declined to disqualify him for cause.

The criminal justice system seeks to obtain jurors who are able to follow the law—"to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." Boulden v. Holman, 394 U.S. 478, 483-84

(1969). As stated, the general proposition established in <u>Wainwright</u> is that a juror may not be challenged for cause unless his beliefs about capital punishment would substantially impair the performance of his duties as a juror. <u>Wainwright</u>, 469 U.S. at 424 n.5; <u>Adams v. Texas</u>, 448 U.S. 38, 39 (1980). The trial court's accreditation of the juror's testimony is entitled to the weight of a jury verdict. <u>State v. Swanson</u>, 680 S.W.2d 487, 489-90 (Tenn. Crim. App. 1984).

In order to prevail on a challenge of this nature, the Defendant must demonstrate not only that a juror should have been removed for cause, but that he had exhausted all of his peremptory challenges. <u>Howell</u>, 868 S.W.2d at 248. Here, the Defendant fails on both counts. First, juror Crabtree, while expressing concern about his ability to disregard reports about the murders, assured the trial court that he would render a verdict based on the proof at trial. Juror Webb, while expressing concern about parole eligibility if the Defendant was found guilty, responded in a manner suggesting that she changed her mind after learning what a life sentence entailed. Neither juror appears to have been challenged by the Defendant. The record does not establish that the trial court abused its discretion.

Secondly, there is no indication that the Defendant utilized all of his peremptory challenges. Each side was entitled to fifteen challenges. Tenn. Code Ann. § 40-18-118 (1997); <u>see also</u> Tenn. R. Crim. P. 24(e)(1). While the record shows that there was a total of twenty-two peremptory challenges, there is no indication as to how many of those were allocated to the Defendant. None of the three individuals challenged for cause served on the jury. Even if the trial court erred by failing to excuse these three prospective jurors, or the others named, such an error is always harmless unless all peremptory challenges were used and one or more of the actual jurors could not be fair and impartial. <u>Howell</u>, 868 S.W.2d at 248; <u>State v. Thompson</u>, 768 S.W.2d 239, 246 (Tenn. 1989).

### III. Evidentiary Issues
### A. Sufficiency of the Evidence

Without supporting argument, the Defendant preliminarily asserts that the convicting evidence was insufficient and that the verdict was contrary to the weight of the evidence. Traditional principles apply to the appellate review of challenges to the sufficiency of the convicting evidence. Initially, a guilty verdict "shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Further, "the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." <u>State v. Vasques</u>, 221 S.W.3d 514, 521 (Tenn. 2007) (citing <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978)). The jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof. <u>State v. Campbell</u>, 245 S.W.3d 331, 335 (Tenn. 2008) (citing <u>Byrge v. State</u>,

575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). The relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing Evans, 838 S.W.2d at 191).

A criminal offense may, of course, be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-57, 461 (Tenn. 1958). Ultimately, however, the jury must decide the significance of the circumstantial evidence, as well as "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). In State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011), this Court abolished any distinction between the standard of proof required at trial in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. The standard of review is, therefore, identical "'whether the conviction is based upon direct or circumstantial evidence.'" Id. at 379 (quoting Hanson, 279 S.W.3d at 275). Appellate courts may not substitute their own inferences for those drawn by factfinders in circumstantial evidence cases. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010).

There was no eyewitness to the murders of Mr. and Ms. Goodman; however, the evidence of the Defendant's guilt, while largely circumstantial, was overwhelming. The proof established that the Defendant, who believed that Mr. Goodman had made the complaint against him that had resulted in an investigation of possible child sex abuse and the potential loss of physical custody of the three children in his home, clearly had a motive. Ms. Tharp, Officer Millsaps, Detective Alvarez, and Preston Adams all testified that they had heard the Defendant, in various conversations, blame Mr. Goodman for influencing B.G. to fabricate the allegation of sex abuse. Officer Millsaps overheard the Defendant, when confronted with the DCS investigation, remark that he might go to jail for murder, but not for child abuse. Further, Shera Crowley, who prepared the Defendant's tax return, confirmed that the Defendant had made threats to take Mr. Goodman's life some three months earlier in connection with issues related to the support of the children.

In addition to motive, there was evidence that the Defendant had the means to commit the murders. After learning from Detective Alvarez that Mr. Goodman planned to file a change of custody suit in Bradley County on the following Monday, the Defendant first asked Adams where he could find a weapon, so as "to take care of the matter before it could

escalate," implying that he meant to prevent Mr. Goodman from traveling to Bradley County. On the Saturday afternoon before the murders, the State offered proof that the Defendant obtained a .22 caliber rifle from Mason, explaining that he had to "take care of some business in Scott County."

There was also evidence that the Defendant had the opportunity to commit the murders in Scott County. Ms. Strunk testified that the Defendant, who had actually lived in the Goodmans' residence for a time, was aware that the door was left unlocked on Saturday nights when E.G. went to the races. On the afternoon of the day of the shootings, Ms. Chumley, a Dollar Store employee in Bradley County, sold a black sweat shirt and pants to an individual she described as a white male. The store's day journal documented the sale. A matching receipt from the same store was later found in a search of the Defendant's car. By 6:00 p.m., the Defendant had acquired the .22 rifle that had been in Mason's possession. The car travel time from Bradley County to Scott County was estimated at between two and two and one-half hours one way. E.G. returned to the Goodman residence in Scott County between 9:30 p.m. and 11:00 p.m. on Saturday. Mason next saw the Defendant in Bradley County at 3:00 a.m. on Sunday morning—sufficient time for the Defendant to travel to Scott County, commit the murders, and return to Bradley County.

Finally, there was proof that the Defendant acknowledged his involvement in the crimes to at least three different individuals. By 8:30 a.m. on the Sunday following the murders, the Defendant had admitted to his friend Mason that he had shot and killed Mr. Goodman and then bought tires for his car, apparently in an effort to conceal his crimes. On the following day, he informed his co-worker Adams that he had purchased oversized shoes, gloves, a hood, and sweat pants at a Dollar Store and, after removing "all hair follicles off of his body," traveled to Scott County and shot the Goodmans in their bedroom. The Defendant told Adams that he then burned his clothes and disposed of the murder weapon. On the Sunday after the murders, the Defendant also contacted Christy Swallows, his mistress and babysitter, blaming Mr. Goodman for the child sex abuse investigation and confiding to her that he had obtained a gun and killed the Goodmans. In our view, therefore, this evidence was clearly sufficient to support each of the two convictions for first degree murder.

### B. Child Sex Abuse Allegations
### 1. Rule 404(b)

The Defendant argues that the trial court failed to comply with Rule 404 of the Tennessee Rules of Evidence on the question of whether to allow Hope Tharp to testify to the details of B.G.'s allegations of child sex abuse. First, he asserts that the trial court failed to conduct an adequate hearing. Second, he submits that the State did not clearly and convincingly establish, as required by the rule, that the sexual abuse had actually taken place.

Third, he maintains that the probative value was outweighed by the danger of unfair prejudice. His final argument is that the trial court erred by allowing the admission of the evidence, despite its hearsay nature, in violation of his right of confrontation under both the state and federal constitutions.

After jury selection, the trial court, in response to a pretrial brief filed by the State seeking permission to offer Rule 404(b) evidence, addressed whether to allow testimony by Ms. Tharp that the Defendant had sexually abused B.G. The transcribed preliminary hearing, which included the testimony of Ms. Tharp, was made a part of the State's presentation and is included as an exhibit to the record. Otherwise, no proof was entered. The Defendant's counsel argued for the exclusion of the evidence as especially prejudicial. While insisting that the Defendant was "entitled to a hearing on the issue," defense counsel suggested, as an alternative to the admission of the details of the sexual abuse allegations, that the State establish motive by reference to the child custody issue, explaining, "[t]hat gets the motive in without the prejudicial effect of the allegations of the sexual abuse." In response, the State contended that the details of B.G.'s complaint to Ms. Tharp were especially probative because of the degree of seriousness of the allegations. As compared to the custody issue, the State asserted that the sex abuse testimony moved the evidence "from two on the motive scale of likely to do it to nine or ten." The State further argued that "even if these allegations [were] totally false . . . you'd be up to about eight on the motive range," implying that their truthfulness or falsity was not particularly relevant.

The trial court, without actually hearing Ms. Tharp's testimony, ruled that the evidence would be admissible so long as "not cumulative and overly prejudicial." In response, the Defendant's counsel remarked, "[W]e're not even talking about a prior conviction here . . . [,] there has been no finding . . . [a]nd that's why we're asking for a hearing." While acknowledging that the evidence was "very prejudicial," the trial court ruled that the probative value outweighed the prejudicial effect, but instructed the State to caution its witnesses not to describe "in a graphic manner . . . as to what the accusations are" and commented that the details were "not necessary and . . . border on undue prejudice." After further argument by the State, however, the trial judge relented, holding that the jury could hear the details, but only once, and explaining that limiting instructions would be provided at the time of its admission.[9]

---

[9] Regarding Ms. Tharp's testimony, the trial court provided jury instructions as follows:

Ladies and gentlemen . . . I am going to give you a legal definition or an instruction concerning some evidence that you may or may not have heard. This is . . . a curative instruction concerning some of the evidence that Ms. Tharp gave you today. Please listen carefully. This will also be included at the final stage. . . . You have heard evidence that the

(continued...)

At trial, Ms. Tharp, when asked by the State to describe her conversation with the Defendant after her interview with the three children in the Sexton residence, testified as follows:

I told Mr. Sexton that B.G. had told me that he had grabbed her by the shoulders and sat her down. And I told him, I said, you know, as I talked to her, she told me some things that didn't make a lot of sense to me. So, I had to have her show me what she was talking about . . . .

So, I told him, I said, I had B.G. show me exactly on the couch how she was sitting. Because I told him, B.G. told me her feet were on the floor, but she was laying on the couch. And I didn't understand how that could occur, which made me think, well, maybe something is not right. So, I told him, I said, I had B.G. showed [sic] me, and B.G. showed me that she was sitting facing him, which would have been in this direction, her feet on the floor, and she was leaning down this way onto the couch. I told him I asked her . . . if he had said anything to her. And I told him, B.G. told me you said, "Close your eyes and open your mouth." And B.G.– I told him, I said, B.G. said that she closed her eyes and she opened her mouth. And when she opened her eyes she saw the bad spot.

And I told him I didn't know what she meant by that, so I asked her to describe that for me. And I told him, she described that for me as the place that he pees and it has a hole in it. And I told him I said, B.G., if you're telling me that you can see his place that he pees but he has on clothes, I don't understand how you can do that. And I told him, B.G. explained to me that you pulled your penis out of your jogging pants and she saw it when she opened her eyes.

And I told him, I said, I asked B.G., well, what happened after that. And I

_____

[9](...continued)
Defendant was accused of sexual abuse of a child. <u>The Defendant is not on trial for any offenses associated with child sexual abuse. You may not consider this evidence to prove the Defendant's disposition to commit the act of premeditated murder.</u> This evidence can be considered by you only for the limited purpose of determining <u>whether it provides motive</u>. In other words, you may consider the accusation only as it tends to show a motive of the Defendant to commit the crime charged in this case. Such evidence of the accusation, if considered by you for any purpose, must not be considered for any purpose other than motive.

(Emphasis added).

explained to him that B.G. told me that she was made to put her mouth onto his penis and suck it.  And I told him that B.G.– I told him, I said I asked her if anything else happened.  And B.G. told me that you made her put your hand on your penis and move it up and down like this.

And I told him I asked B.G., can you tell me anything else about this that would help me understand what happened.  And I told him that B.G. told me that it tasted yucky.  And I told him, I asked B.G. if anything had come out and I told him that B.G. told me no, nothing had come out, but that she could taste it.

I also told him that B.G. told me that he had pushed her off the couch and that B.G. told me he told her if she ever told, she would never see her dad again.[10]

Sexton, 2010 WL 5054428, at *20.

The Court of Criminal Appeals held that the trial court had conducted a hearing outside the jury's presence, had determined, as required, that a material issue existed as to motive, and had properly found, in accordance with the rule, that the probative value outweighed the prejudice.  Id. at *17.  However, the court also found that because the trial court had erred by failing to actually require Ms. Tharp to testify at the pretrial hearing and by failing to timely determine whether the State had proved the act of child sex abuse by

---

[10] At the time of these acts, the applicable statute provided as follows:

      (a) Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age.
      (b) Rape of a child is a Class A felony.
      (c) When imposing sentence under the provisions of title 40, chapter 35, for a conviction under this section, the court shall consider as an enhancement factor that the defendant caused the victim to be mentally incapacitated or physically helpless by use of a controlled substance.

Tenn. Code Ann. § 39-13-522 (1997).

A person convicted of rape of a child is further "required to serve the entire sentence imposed by the court undiminished by any sentence reduction credits such person may be eligible for or earn." Tenn. Code Ann. § 39-13-523(b) (1997 & Supp. 2000).  In addition, such a defendant is required to serve a sentence of community supervision for life.  See Tenn. Code Ann. § 39-13-524 (1997 & Supp. 2000).  Aggravated sexual battery, when the victim is less than thirteen years of age, is a Class B felony.  Tenn. Code Ann. § 39-13-504(a)(4), (b) (1997).

clear and convincing evidence,[11] the ruling of the trial court was subject to de novo review rather than the abuse of discretion standard.  Id.; see also State v. Gilliland, 22 S.W.3d 266, 270, 273 (Tenn. 2000) (holding that even though there was substantial compliance with the procedural requirements of Rule 404(b), the trial court abused its discretion by allowing evidence of a prior crime); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).  After noting that the State had submitted a transcript of the preliminary hearing, which included Ms. Tharp's testimony, the Court of Criminal Appeals concluded that the evidence of the sexual abuse of B.G. was indeed clear and convincing and that the probative value as to motive, as indicative of identity and intent, outweighed the unfair prejudicial effect.[12]  See Sexton, 2010 WL 5054428, at *18.

Initially, the current version of Rule 404(b) of the Tennessee Rules of Evidence establishes the procedure for consideration of the admission of prior bad acts:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (emphasis added).  The comments to the rule provide that the evidence of other crimes, wrongs, or acts should generally be excluded unless relevant to an issue

---

[11] At the hearing on the motion for new trial, the trial court acknowledged its oversight and found that the State had provided clear and convincing evidence of the "crime, wrong, or act."

[12] Cf. State v. Wilson, 164 S.W.3d 355, 363 (Tenn. Crim. App. 2003) (upholding the admission of an award of temporary custody of the defendant's son to the victim as evidence of motive in a subsequent murder trial).

other than the character of a defendant, such as identity, motive, intent, or absence of mistake. See Tenn. R. Evid. 404, Advisory Comm'n cmts.; Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). In State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985), the case upon which the rule is based, this Court specifically held that if the evidence is otherwise inadmissible, the trial court must first find that the other crime, wrong, or act has been clearly and convincingly established in a pretrial hearing. See also Tenn. R. Evid. 404, Advisory Comm'n cmts. In 2003, some two years after this 2001 trial, Rule 404(b) was amended to confirm the "clear and convincing" requirement explicated in Parton. Tenn. R. Evid. 404(b)(3).[13]

As a general rule, trial courts have been encouraged to take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008) (internal quotation marks omitted). In Old Chief v. United States, 519 U.S. 172, 181 (1997), the United States Supreme Court pointed out that "'the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.'" (quoting United States v. Moccia, 681 F.2d 61, 63 (1st Cir. 1982)); see also Michelson v. United States, 335 U.S. 469, 475-76 (1948). In Dotson, this Court reaffirmed the policy of exclusion:

> The rationale behind the general rule is that admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge. . . . As this Court has consistently cautioned, the jury should not "be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . evidence relating to the charged offense."[14]

254 S.W.3d at 387 (quoting Spicer v. State, 12 S.W.3d 438, 448 (Tenn. 2000)) (footnote

---

[13] While the "clear and convincing" prong was not a part of Tennessee Rule of Evidence 404(b) at the time of the trial, the Court's opinion in Parton eighteen years earlier announced this "clear and convincing" requirement in the 404(b) context.

[14] While an individual to whom a child victim makes a "fresh complaint" of being raped may not testify to the allegations by the child in a subsequent prosecution for that crime, State v. Livingston, 907 S.W.2d 392, 395 (Tenn. 1995), individuals who hear such a complaint from an adult victim may testify for the limited purpose of corroborating the victim's testimony. See generally State v. Kendricks, 891 S.W.2d 597 (Tenn. 1994).

added).

As directed by the terms of Rule 404(b), the trial court must first hold a hearing outside the presence of the jury. Tenn. R. Evid. 404(b)(1). While the Defendant's counsel insisted on a "hearing," the State offered only its brief and the preliminary hearing transcript. The burden of persuasion regarding admissibility under 404(b) rested with the State. See State v. Stinnett, 958 S.W.2d 329, 330 n.5 (Tenn. 1997) (stating that the "burden of introducing evidence sufficient to support a finding that the requirements of an evidence rule are satisfied remains on the proponent of the evidence"). By failing to produce witnesses who might have testified to first-hand knowledge of the Defendant's having sexually abused B.G., the State risked being unable to satisfy the requisite standard. Nevertheless, absent any indication that the Defendant suffered a disadvantage for lack of a more extended hearing, the inadequacy of the proceeding, standing alone, would not serve as a basis for exclusion.

There are three other criteria. The State satisfied the first, that there was a material issue other than that the conduct conformed to a character trait. Motive, as it related to the identity of the Defendant and his intent to commit the murders, qualified as a relevant issue at trial. The remaining two criteria relate to whether the proof of the "crime, wrong, or act" was clear and convincing and whether its probative value was outweighed by the danger of unfair prejudice.

As pointed out by the Court of Criminal Appeals, the trial court not only "failed to receive the proposed testimony of Ms. Tharp" at the hearing, but also "had an obligation at the time of the hearing to state on the record whether the prior act was proven by clear and convincing evidence," and, therefore, there was no substantial compliance with this segment of the rule. Sexton, 2010 WL 5054428, at *17. In consequence, the trial court's ruling is not entitled to deference in this appeal. DuBose, 953 S.W.2d at 652.

As indicated, other than the preliminary hearing testimony of Ms. Tharp quoting B.G., the victim of the child sex abuse, and confronting the Defendant with the details of B.G.'s allegations, the State offered no proof of the "crime, wrong, or act." Clear and convincing evidence is that which leaves "'no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" Grindstaff v. State, 297 S.W.3d 208, 221 (Tenn. 2009) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Because B.G. did not testify at the hearing, Ms. Tharp's recitation of her allegations qualified as hearsay. The rule against the admission of hearsay evidence is based upon the premise of unreliability. Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[3][a], at 8-11 (5th ed. 2005) [hereinafter Cohen]. If an out-of-court statement is offered to prove the truth of the matter asserted, the dual areas of concern are that the declarant was not subject to cross-examination under oath and that the demeanor of the declarant is not subject to scrutiny. Id.

Ms. Tharp's recitation of B.G.'s allegations for Rule 404(b) purposes was offered by the State to clearly and convincingly establish the prior "crime, wrong, or act." The matter asserted for purposes of the hearing was that the wrongful act of sexual abuse of B.G. had actually taken place.

Other state courts have held that inadmissible hearsay is insufficient to establish a prior bad act under Rule 404(b). For example, in State v. Charo, 754 P.2d 288, 290 (Ariz. 1988), the Arizona Supreme Court stated that prior acts "may be shown through hearsay testimony if the testimony comes within one of the exceptions to the hearsay rules." See also State v. Pullens, 800 N.W.2d 202, 222 (Neb. 2011) (in holding that evidence showing a prior bad act satisfied a hearsay exception, explaining other courts' position that a prior act could be established through hearsay testimony, but only so long as the testimony came within one of the exceptions to the hearsay rule). Because of the inherent unreliability of Ms. Tharp's hearsay recollections of B.G.'s allegations, the proof does not meet the clear and convincing standard and, as a result, should have been excluded under Rule 404(b). See Parton, 694 S.W.2d at 303.[15]

The rule, of course, further requires that the evidence be excluded unless the probative value outweighs the danger of unfair prejudice. The question is not whether the evidence is prejudicial, but whether it is unfairly prejudicial. DuBose, 953 S.W.2d at 654-55. The term "unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Id. at 654 (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)). As indicated, the rule is generally one of exclusion unless the evidence of the prior bad act is relevant to an issue other than the character of the defendant, such as identity, intent, motive, opportunity, or rebuttal of a mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995).

The State cites State v. Moss, 13 S.W.3d 374 (Tenn. Crim. App. 1999), in support of its argument that the trial court properly admitted evidence of the prior sex abuse. In Moss, the State charged that the defendant had murdered his estranged wife in order to regain custody of his daughter. Id. at 382-84. The trial court conducted a hearing, complied with the requirements of Rule 404(b), and permitted the daughter to testify at trial that the defendant's expression of desire to have sexual relations with her served as his motive for

---

[15] As Tennessee Rule of Evidence 104(a) explains, in ruling on "[p]reliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence[,] . . . the court is not bound by the rules of evidence." Thus, the mere fact that the evidence was hearsay is not dispositive. Rather, because the only evidence offered to prove the act alleged was hearsay that did not fall under any exception, the evidence was, by definition, unreliable, and thus, was not sufficient to meet the "clear and convincing" requirement.

the murder. Id. The Court of Criminal Appeals, which found that the trial court in Moss had complied with the dictates of the rule, concluded that the trial court had not abused its discretion by admitting the prior bad act and affirmed. Id. at 383-84. Moss is, however, distinguishable from the case before us. In Moss, the child victim testified at the Rule 404(b) hearing, the diary of the defendant corroborated the child victim's testimony, and the trial court followed the dictates of the rule. Id. Not only was the prior misconduct established by clear and convincing evidence, but when weighed against the danger of unfair prejudice, the probative value of the evidence tipped the scales in favor of admission because motive could not otherwise be satisfactorily demonstrated.

This Court has specifically addressed the dangers of prior, sex-related bad acts where a child victim is involved:

> The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial.

State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citation omitted). In Getz v. State, 538 A.2d 726 (Del. 1988), a case cited by this Court in the Rickman opinion, the Delaware Supreme Court commented upon the rationale behind the rule:

> We are no more inclined to endorse [the assumption that a defendant's propensity for satisfying sexual needs is so unique that it is relevant to his guilt] than we are to consider previous crimes of theft as demonstrating a larcenous disposition and thus admissible to show proof of intent to commit theft on a given occasion.

Getz, 538 A.2d at 734; see also Rickman, 876 S.W.2d at 829.

Acts of sexual abuse against a child victim by an adult entrusted with custodial responsibilities are especially inflammatory. Outrage is a typical response.[16] Few "crimes,

---

[16] "The American public has utterly lost its willingness to defend institutions and individuals accused of covering child sex abuse, who fail to protect children, [and] who fail [to do] what's right." Julie Mack, Reaction to Penn State scandal shows shift in thinking on sex-abuse coverups, mlive.com (Nov. 12, 2011), http://www.mlive.com/opinion/kalamazoo/ index.ssf/2011/11/julie_mack_column_some_thought.html; see also Michael McCann, Sandusky grand jury presentment doesn't tell the whole story, SI.com (Nov. 11, 2011), http://sportsillustrated.cnn.com/2011/writers/michael_mccann/11/11/sandusky.indictment/index.html.

wrongs, or acts" evoke a similar level of prejudice:

> In addition to the dangers posed by the use of propensity evidence in general, "[t]here is no subject which elicits a more passionate response than the sexual exploitation of children. Society abhors, and rightfully so, the victimization of the defenseless child." United States v. Villard, 700 F. Supp. 803, 809 (D.N.J.1988); see also Werne v. State, 750 N.E.2d 420, 424 (Ind. Ct. App. 2001). The public has become acutely aware of and concerned about the dangers posed by those who exploit children.
>
> . . . .
>
> This danger is particularly acute where the character or credibility defect is one that garners the understandable public revulsion that is directed by the public towards sexually exploitative acts towards children . . . .

State v. Rodriguez, 254 S.W.3d 361, 376-77 (Tenn. 2008). Because the statements of the Defendant to Ms. Tharp, and the testimony of Officer Millsaps, Detective Alvarez, Adams, Mason, and Ms. Swallows during the course of the trial—as outlined in the factual summary—established the Defendant's motive to kill, the hearsay testimony offered by Ms. Tharp, while compelling in its detail, was cumulative on the issue of motive. For that reason, the probative value of Ms. Tharp's hearsay testimony as to the Defendant's guilt of the murders of the Goodmans was not essential to the State's case. Thus, contrary to the requirements for admission under Rule 404(b), the unfair prejudicial effect of the alleged sex abuse outweighed the probative value as to motive.

## 2. Right of Confrontation

The Defendant also asserts that the allegations made by B.G. to Ms. Tharp violated his right of confrontation. After addressing the Rule 404(b) claim and finding that the prior bad act had been clearly and convincingly established, the Court of Criminal Appeals ruled that the testimony was not hearsay because it was not admitted to prove the truth of the sexual abuse, and the purpose of the testimony was to simply establish that the Defendant had a motive, regardless of the veracity of the allegation. Sexton, 2010 WL 5054428, at *22. That is, the Defendant would have had a motive to harm whoever was responsible for the allegation, whether the sexual abuse charge was truthful or not. The Court of Criminal Appeals observed that there was no infringement of the right of confrontation because Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004), does not apply to statements that are not hearsay. Sexton, 2010 WL 5054428, at *21. If offered to prove the truthfulness of the sexual abuse allegations in order to imply that the Defendant's character was such that he also had the propensity to commit the murders, the testimony was inadmissible under

Crawford as testimonial. If not offered for the truthfulness of the allegations, but to establish that the allegations had been made regardless of their truthfulness and only "to show a motive of the Defendant to commit the crime charged," the evidence should nevertheless have been excluded under Rule 403.

"[W]hether the admission of hearsay statements violated a defendant's rights under the Confrontation Clause is purely a question of law." State v. Maclin, 183 S.W.3d 335, 342 (Tenn. 2006) (citing Lilly v. Virginia, 527 U.S. 116, 125 (1999)). Questions of law or the application of the law to the facts found by the trial court are subject to de novo review. Id. at 343 (citing State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)); Beare Co. v. Tenn. Dep't of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993). The Confrontation Clause of the Sixth Amendment to the United States Constitution, providing that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," affords "two types of protection for criminal defendants: the right to physically face the witnesses who testify against the defendant, and the right to cross-examine witnesses." State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996) (citing State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992)); see also Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987). The Confrontation Clause is designed "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990). The Tennessee Constitution contains different terminology, providing "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. Nevertheless, "this Court has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated." Maclin, 183 S.W.3d at 343 (citing State v. Bush, 942 S.W.2d 489, 511 n.2 (Tenn. 1997) (appendix)).

In Crawford, the Supreme Court ruled that "testimonial" hearsay is admissible only where the declarant is unavailable and there was "a prior opportunity for cross-examination." 541 U.S. at 68. Afterward, in Davis v. Washington, 547 U.S. 813 (2006), and its companion case, Hammon v. Indiana, 547 U.S. 813 (2006), the Supreme Court ruled that statements are "testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822.

Ms. Tharp's recitation of B.G.'s testimony during the course of the trial, if offered for the truth of the matter asserted, qualified as testimonial and should have been excluded under Crawford and its progeny. See State v. Lewis, 235 S.W.3d 136, 142-45 (Tenn. 2007). Although not presented as an issue at trial, the State now asserts, as an alternative ground for the admission of her testimony, that Ms. Tharp's recollection of B.G.'s statement should not

have been addressed under Rule 404(b) and that a <u>Crawford</u> right of confrontation analysis is unnecessary because the "fact of the sex abuse allegation" was relevant, was not necessarily a prior "bad act," and, most importantly, was not offered for truthfulness. In support of this contention, the State cites <u>United States v. Blackthorne</u>, 37 F. App'x 88, 2002 WL 971621, at *10-11 (5th Cir. 2002), which held that Rule 404(b) is inapplicable when "the evidence of <u>allegations</u> is probative . . . on the question of motive" and is not offered to show that the misconduct actually took place. The State, therefore, submits that Ms. Tharp's testimony was relevant, as defined by Rule 401 of the Tennessee Rules of Evidence, was admissible by the terms of Rule 402, and was subject to exclusion only by the terms of Rule 403, which provides as follows:

> Although relevant, evidence may be excluded if its probative value is <u>substantially outweighed</u> by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403 (emphasis added).

This rule adopts the common law principle that trial courts, despite the relevance of certain evidence, possess the inherent authority to exclude any evidence that would "threaten the fairness of the trial process." Cohen, at 4-60. While relevant evidence under Rule 403 should generally be admitted, other considerations may result in exclusion. <u>See generally</u> <u>Banks</u>, 564 S.W.2d at 949-53. The rule, as stated, permits the admission of relevant evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403. It is our view that even though Rule 403 requires a higher standard of prejudice than that which is set out in Rule 404(b), the testimony at issue here meets the higher standard. Other evidence presented during the course of the trial conclusively established the Defendant's motive to murder Mr. Goodman, thereby limiting the value of Ms. Tharp's confirmation of B.G.'s allegations. While it is true that B.G.'s allegations, regardless of their veracity, had probative value as to motive for the murder of Mr. Goodman, Ms. Crowley, Officer Millsaps, Adams, and Ms. Swallows all testified to threats made by the Defendant on various occasions toward Mr. Goodman. As indicated in our <u>Rodriguez</u> opinion, few, if any, subjects arouse the level of revulsion as does the rape or sexual exploitation of a child victim. 254 S.W.3d at 376-77. Even if the proof of the allegation by B.G. was not designed to place before the jury details of the sexual abuse in an effort to establish the Defendant's criminal propensity, exclusion is appropriate when the balancing test under Rule 403 does not favor admission. In summary, because the motive for the murder of Mr. Goodman was clearly established through other of the State's witnesses, the probative value of B.G.'s allegations, as related by Ms. Tharp, insofar as it established motive, was cumulative. In consequence, the inflammatory nature of the

allegations of sexual misconduct was such that Ms. Tharp's recitation of their details should have also been excluded under a Rule 403 analysis.

### C. Polygraph

The Defendant contends that the trial court erred by admitting references to a polygraph examination through Officer Millsaps and Detective Alvarez. In response, the State contends that the Defendant either waived the issue or opened the door for the admission of the evidence in the following ways: by failing to lodge an objection to the polygraph testimony by Officer Millsaps until an additional reference was made during a redirect examination by the State; by failing to object at all to the polygraph reference during the testimony of Detective Alvarez; and by cross-examining the witness on the topic prior to further references to the polygraph evidence on redirect examination.

Simply stated, polygraph evidence is inadmissible. State v. Damron, 151 S.W.3d 510, 515-16 (Tenn. 2004). This Court has repeatedly held that the results of a polygraph examination are inherently unreliable. State v. Torres, 82 S.W.3d 236, 252 n.20 (Tenn. 2002); State v. Hartman, 42 S.W.3d 44, 61-62 (Tenn. 2001). The "lack of any indicia of reliability means it is not probative." Hartman, 42 S.W.3d at 60. Furthermore, "testimony regarding a [d]efendant's willingness or refusal to submit to a polygraph examination is not admissible." State v. Stephenson, 195 S.W.3d 574, 599 (Tenn. 2006) (appendix) (quoting State v. Pierce, 138 S.W.3d 820, 826 (Tenn. 2004)). One rationale for excluding the evidence is that it lacks relevance. See Tenn. R. Evid. 402; United States v. Scheffer, 523 U.S. 303, 309 n.5 (1998) (holding that polygraph evidence is unreliable).

The trial court, while addressing the issue after the trial, pointed out that the Defendant had failed to lodge a contemporaneous objection during the testimony by Officer Millsaps, and first objected only after the direct examination of Officer Millsaps by the State, cross-examination by the defense, and re-direct by the State. While acknowledging the inadmissibility of the evidence, the trial court concluded that, in the context of all of the proof of guilt, the error qualified as harmless. The Court of Criminal Appeals ruled similarly, finding that the Defendant had waived the issue by failing to make a timely objection and thereby providing the trial court with an opportunity to either rule out the evidence or mitigate any harm caused by its admission. Sexton, 2010 WL 5054428, at *23; see Tenn. R. App. P. 36(a). The Court of Criminal Appeals further found that the erroneous admission of the polygraph evidence, if not waived, had no effect on the verdict. Sexton, 2010 WL 5054428, at *23.

The record demonstrates that the State, during the direct examination of Officer Millsaps, asked about the Defendant's refusal to take a polygraph examination. There was no objection by the defense at that time. During re-direct by the State, however, the

Defendant did object. Later in the trial, Detective Alvarez confirmed that the Defendant had declined to take the test.

In our view, any reference to a possible polygraph examination or the refusal to submit to such an examination had no place in this trial. The State should not have asked the question. The defense should have lodged a more timely objection. Curative instructions should have been provided. See Stephenson, 195 S.W.3d at 598-99 (appendix); State v. Atkins, 681 S.W.2d 571, 578 (Tenn. Crim. App. 1984). Moreover, the Defendant did not "open the door." That principle applies only when the complaining party elicits "testimony he [later] assigns as error." State v. Robinson, 146 S.W.3d 469, 493 (Tenn. 2004). While a litigant is not "permitted to take advantage of errors which he himself committed, or invited, or induced the trial [c]ourt to commit," Norris v. Richards, 246 S.W.2d 81, 85 (Tenn. 1952) (quoting Gentry v. Betty Lou Bakeries, 100 S.W.2d 230, 231 (Tenn. 1937)), that is not the case here. Allowing the references to the polygraph test was error. To its credit, the trial court acknowledged the error during the hearing on the motion for new trial, but ruled that the admission of the evidence did not affect the results of the trial.[17]

### D. Admission of .22 Rifle

During a consent search of the Defendant's home, officers found an inoperable .22 caliber rifle, which was made an exhibit at the trial. The rifle was clearly not the murder weapon. Although the jury was made aware that the rifle was not used in the murders, the Defendant maintains that the evidence was irrelevant and should have been excluded by the trial court.

The trial court found that the evidence was relevant, observing that because the .22 rifle was inoperable, it tended to explain why the Defendant found it necessary to acquire a gun from Clinton Daniel Mason. "Relevant evidence," of course, is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The Court of Criminal Appeals ruled that the trial court acted within its discretion by admitting the evidence and that there was little possibility of prejudice. Sexton, 2010 WL 5054428, at *24.

Trial courts have a wide latitude of discretion in determining whether evidence is relevant. See State v. Dellinger, 79 S.W.3d 458, 485 (Tenn. 2002) (appendix); DuBose, 953

---

[17] "[T]he Tennessee appellate courts frequently conclude that the error was harmless. They are especially likely to uphold the lower court if there was no timely objection and if the side objecting to the question also interrogated the witness about the polygraph." Cohen, at 7-61 (footnote omitted).

S.W.2d at 652; <u>State v. Porterfield</u>, 746 S.W.2d 441, 450 (Tenn. 1988). There is an abuse of discretion only when the trial court has "applied an incorrect legal standard, or reached a decision which is against logic or reasoning," resulting in an injustice to a defendant. <u>State v. Shuck</u>, 953 S.W.2d 662, 669 (Tenn. 1997).

In our view, the evidence was marginally relevant for two reasons. First, it tended to explain why the Defendant found it necessary to obtain a weapon from Mason. Secondly, the evidence suggested that the Defendant had a familiarity with a .22 caliber rifle. Thus, the trial court did not abuse its discretion by admitting the evidence.

### E. Dollar Store Receipt

During the course of the investigation, officers searched the Defendant's automobile and found a Dollar Store receipt for a fleece top and pants. The contents of the receipt matched the cash journal of the store as to time and amount, indicating that the Defendant purchased a fleece top and pants hours before the murders. In this appeal, the Defendant argues that the search by the police violated article I, section 7 of the Tennessee Constitution and the Fourth Amendment to the United States Constitution. The Defendant also argues that his due process rights under the Fourteenth Amendment were violated when Agent Brakebill was permitted to testify that the Defendant had consented to the search. The Defendant did not, however, file a motion to suppress and did not make a contemporaneous objection to the admission of the evidence.

Agent Brakebill's direct testimony on the subject provided as follows:

Q. [Y]ou did [the search of the car] with the consent of Ms. Sexton; is that right?
A. With the consent of Mr. and Mrs. Sexton.

During cross-examination by defense counsel, the following questions and answers took place:

Q. Did you have consent to search the vehicle?
A. Yes, sir, we did.
Q. Who gave that consent?
A. He [the Defendant] gave the consent to [Detective] Alvarez and I saw it had been signed off and initialed . . . .
Q. Okay. Well consent is consent. We won't get into that. Okay?
A. Yes, sir.

The Court of Criminal Appeals, holding that the issue had been waived, further noted that

-42-

the Defendant failed to provide citations to the record as to this issue. <u>Sexton</u>, 2010 WL 5054428, at *25.

Rule 27(a)(7)(A) of the Tennessee Rules of Appellate Procedure requires "citations to the authorities and appropriate references to the record." Otherwise, the issue may be considered waived. <u>State v. Killebrew</u>, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988); <u>see also</u> <u>State v. Schaller</u>, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). Moreover, constitutional objections to the admission of evidence may be waived by the failure to cite appropriate authority. <u>State v. Boling</u>, 840 S.W.2d 944, 949 (Tenn. Crim. App. 1992). Because the Defendant has failed to specifically identify the product of the search, this Court must infer that the Dollar Store receipt is the item at issue. Waiver notwithstanding, the only testimony is that the Defendant consented to the search of his vehicle. "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." <u>State v. Berrios</u>, 235 S.W.3d 99, 109 (Tenn. 2007); <u>see generally</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973). Absent any indication that the Defendant did not consent to the search of the vehicle, the evidence was properly admitted at trial.

### F. References to Sherry Sexton

The Defendant's wife, Sherry Sexton, did not testify at trial. As indicated, however, Detective Alvarez testified that, three days after the discovery of the victims' bodies, Ms. Sexton had tried to reach him by telephone and that he had recorded his return call to her. Detective Alvarez described her as sounding desperate. He testified that when he and Agent Brakebill met with Ms. Sexton later that night for an interview, the Defendant arrived thirty minutes later and insisted that he be permitted to talk with her, claiming that she was too emotional to give a statement. The evidence established that Ms. Sexton was taken to another location and transported to a safehouse in McMinn County only hours before the Defendant's arrest.

The Defendant, who did not make a contemporaneous objection, complains about the admission of the testimony relating to Ms. Sexton's interview, arguing that a reasonable inference could be drawn that she had implicated him in the murders. The Defendant contends, therefore, that this evidence should have been excluded, arguing a violation of his right of confrontation under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The Court of Criminal Appeals, while pointing out that the Defendant had failed to make contemporaneous objections or make specific citations to the record in his appellate brief, nevertheless addressed the merits, and concluded that because Ms. Sexton did not actually testify and because the Defendant took advantage of the opportunity to cross-examine both Detective Alvarez and Agent Brakebill, the right of confrontation was not implicated. <u>Sexton</u>, 2010 WL 5054428, at *24.

Nonverbal conduct can be hearsay. Rule 801(c) of the Tennessee Rules of Evidence defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted." A statement may be either "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). The Advisory Commission comments to the rule provide, in part, as follows:

> Rule 801 restates Tennessee common law. Part (a) makes hearsay only such nonverbal conduct as the declarant actor intends as an assertion. The common law, stemming from Wright v. Tatham, 112 Eng. Rep. 488 (Exch. Ch. 1837), included in the hearsay definition assertions that might be inferred from the conduct but that were unintended by the actor. Consequently, Tennessee has defined flight from a crime scene as hearsay, although the courts admit the evidence through the exception for party admissions. Under the . . . rule, the evidence would be admissible as nonhearsay, the declarant obviously not intending to assert guilt by flight.

Tenn. R. Evid. 801, Advisory Comm'n cmts.

Nonverbal conduct, therefore, qualifies as a "statement" only if the conduct is "intended by the person as an assertion." Tenn. R. Evid. 801(a). The comments indicate that our rule represents a change in the common law which precluded "assertions that might be inferred from the conduct but that were unintended by the actor." Tenn. R. Evid. 801, Advisory Comm'n cmts. The term "assertion," while not defined by the rules, "has the connotation of a forceful or positive declaration." State v. Land, 34 S.W.3d 516, 525 (Tenn. Crim. App. 2000) (quoting Webster's Ninth New Collegiate Dictionary 109 (1985 ed.)). As applied to these circumstances, it is not apparent that Ms. Sexton intended to declare the guilt of the Defendant by arranging an interview with the officers. It is only when the declarant intends an assertion by conduct that the evidence is excluded as hearsay. See Hulsey v. Bush, 839 S.W.2d 411, 413 (Tenn. Ct. App. 1992); see also Cohen, at 8-19. In our view, because Ms. Sexton's conduct did not qualify as hearsay, the testimony of Detective Alvarez and Agent Brakebill relating to her conduct did not violate the Defendant's right of confrontation.

### G. Prior Threat

The Defendant also asserts that the trial court should have excluded testimony by Shera Crowley—who prepared the Defendant's tax return on January 31, 2000—that the Defendant threatened to kill Mr. Goodman if he claimed E.G., Mr. Goodman's oldest child, as a dependant for income tax purposes. The Defendant did not object to the testimony and, moreover, during cross-examination, elicited the following comment by Ms. Crowley:

"[S]omeone . . . claiming their stepchild and they're claiming they don't live with the mother, that is a red flag for me."

In this appeal, the Defendant complains that the trial court erroneously allowed the evidence because it suggested that the Defendant intended to defraud the Internal Revenue Service by claiming a stepchild as a dependant. Also, the Defendant contends that the State exacerbated the error by making reference to the evidence during closing argument, a related issue that will be later addressed in the prosecutorial misconduct section of this opinion.

As indicated, trial courts should avoid propensity evidence or proof tending to establish the bad character of a defendant; however, the crux of Ms. Crowley's testimony was that the Defendant, some three months prior to the murders, threatened to kill Mr. Goodman in the event of a dispute regarding his entitlement to claim one or more of Mr. Goodman's children as a dependant for income tax purposes. A threat of this nature is, of course, relevant under these circumstances to establish the level of the Defendant's animosity towards Mr. Goodman. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence . . . more probable or less probable." Tenn. R. Evid. 401. Absent other rules, laws, or constitutional provisions to the contrary, "relevant evidence is admissible." Tenn. R. Evid. 402. Evidence of animus towards a victim is relevant to establish motive in a subsequent prosecution for murder. See, e.g., State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003); State v. Elrod, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986). Accordingly, the trial court did not err by admitting the evidence of the alleged prior threat.

## H. Speeding Arrest

Randall Boston, the Defendant's only witness, testified for the sole purpose of establishing the car travel time from Bradley County to the Goodmans' residence in Scott County if driven within the speed limits. During cross-examination, the State, while attempting to elicit an acknowledgment that the Defendant may have been able to reduce the amount of time taken for the trip by driving faster, asked Boston whether he was aware that the Defendant had received a speeding ticket for driving ninety-seven miles per hour along the same route only two days after the murders. Boston answered, "No."

Although the Defendant failed to object to the admission of the evidence, the Defendant argued on appeal that the trial court erred by permitting the reference to the speeding charge and that the evidence qualified as inadmissible hearsay. The Court of Criminal Appeals concluded that the Defendant had waived the issue by failing to object, Tenn. R. App. P. 36(a), and, further, that the testimony had only marginal relevance, indicating only that the Defendant could have driven over the speed limit. Sexton, 2010 WL 5054428, at *25. Although we tend to agree with that assessment, trial courts should always

take precautions to ensure that juries do not convict based on a defendant's propensity to commit crimes, wrongs, or bad acts rather than the offense charged. See Rodriguez, 254 S.W.3d at 375-76.

## IV. Prosecutorial Misconduct

Following the hearing on the motion for new trial, the trial court ruled as follows regarding the Defendant's allegations of prosecutorial misconduct:

> Although the court had instructed counsel that the pretrial motion on [the marital confidential communication privilege] would be dealt with at trial, the defendant did not object when the state first referred to the wife's failure to testify and prior testimony in opening statement. Under these circumstances, this court finds that the defendant is not entitled to a new trial on this issue. Even assuming that any error occurred, it would be harmless.
>
> . . . .
>
> The defendant alleges multiple [other] instances of prosecutorial misconduct which he argues warrant a new trial. Several of these allegations relate to issues of admissibility already ruled upon above and are also without merit here. In addition, the defendant complains of statements by the prosecution that vouched for witnesses and which speculated about things not in evidence. This court finds no basis for relief on this issue.

The Court of Criminal Appeals addressed these and other allegations of prosecutorial misconduct, considered some of the issues as having been waived by the Defendant, and, while classifying a few of the arguments by the State as inappropriate, ultimately concluded that the misconduct did not warrant either a new trial or new sentencing hearing. See Sexton, 2010 WL 5054428, at *26-30.

In this appeal, the Defendant argues that the trial court's ruling was in error and insists that there were instances of prosecutorial misconduct in the opening statement, in the course of the guilt phase of the trial testimony, and in the closing argument of both the guilt and penalty phases of the trial. First, he asserts that during opening statement, the prosecution improperly informed the jury that B.G. had reported sex abuse to her teacher and to the DCS—facts that should not have been permitted as evidence—and improperly revealed the fact that Ms. Sexton had previously testified against the Defendant during the preliminary hearing, but would not do so at trial because of marital privilege. Second, he complains that, in the course of the trial testimony, the prosecution was guilty of misconduct in several ways: by improperly inquiring about the Defendant's willingness to take a polygraph examination,

-46-

by asking questions suggesting that Ms. Sexton had implicated the Defendant in the murder during her interview with Detective Alvarez and Agent Brakebill, by submitting a .22 rifle as an exhibit, by referring to evidence seized from the Defendant's automobile, and by accusing the Defendant of speeding, issues which have been previously addressed in this opinion in the context of admissibility.[18]  Third, the Defendant contends that the prosecution committed numerous acts of misconduct in closing argument during both the guilt and the sentencing phases of the trial.  In response, the State points out that the arguments either were not improper or that the Defendant, by failing to lodge objections during the arguments, waived any claim for relief on appeal.

### A. Opening Statement

Our statutes entitle the parties in a jury trial to make opening statements prior to the presentation of the case "setting forth their respective contentions, views of the facts and theories of the lawsuit."  Tenn. Code Ann. § 20-9-301 (2009); State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992).  Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove."  State v. Stout, 46 S.W.3d 689, 713 (Tenn. 2001) (appendix) (quoting Harris v. Baptist Mem'l Hosp., 574 S.W.2d 730, 732 (Tenn.1978)).  Trial courts should allow the presentation of a summary of the facts supportive of the respective theories of the case, only so long as those "facts are deemed likely to be supported by admissible evidence." Stanfield v. Neblett, 339 S.W.3d 22, 41-42 (Tenn. Ct. App. 2010).  Opening statements, while not evidence,  must "be predicated on evidence introduced during the trial of the case." See State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Robert E. Burch, Tennessee Handbook Series: Trial Handbook for Tennessee Lawyers § 7.2 (2007) ("The attorney may, of course, never refer to facts or conditions which are not admissible in evidence."); see also State v. Van Tran, 864 S.W.2d 465, 475 (Tenn. 1993).  No reference should be made to facts and circumstances which are not admissible in evidence. 75A Am. Jur. 2d Trial §§ 525, 526 (West 2012).

During opening remarks, the State asserted that the Defendant "was confronted by the fact that his step-daughter had disclosed to her teacher and to the DCS worker that he was sexually molesting her."  Because the hearsay testimony offered by Ms. Tharp should have been excluded, as previously indicated in this opinion, and because the record does not otherwise contain any other proof that B.G. had made such disclosures to her teacher and to the DCS worker, the statement was not predicated on evidence that would have been properly admitted at trial.  Our view is retrospective, however.  In fairness to the State, its statement

---

[18] The Court of Criminal Appeals did not address issues related to trial testimony during its assessment of the prosecutorial misconduct, having found in favor of the State as to each of the claimed evidentiary errors.  See Sexton, 2010 WL 5054428, at *26-30.

was based on the fact that the trial court had ruled at the conclusion of the Rule 404(b) pretrial hearing that Ms. Tharp could testify in detail about B.G.'s allegations. Nevertheless, the evidence should not have been admitted, and the comments by the prosecution exacerbated the harmful nature of the improperly admitted evidence.

The prosecution, in an effort to buttress its claim at trial that the Defendant had tried to frustrate the police investigation of the murders, also made the following statement to the jury during opening remarks:

> You know, a wife can't testify against her husband . . . , and he makes sure he's got Sherry [Sexton] under his thumb. But a few days after the murder, he makes the mistake of not being at home and [she] runs down to the police station. She contacts the authorities. And when he gets home and she's not there, he's worried to death. . . . He goes and looks for her and finds her talking to officers. He tries to interfere with that interview that's taking place. But it's too late. She's given an interview and she later even testifies against him. But through his manipulation, she's back on his side now. And of course, you can't testify – you can't force a wife to testify against her husband. And he believes he can manipulate and control through either charm or intimidation everybody he needs to . . . .

(Emphasis added).

The Defendant had earlier filed pretrial motions seeking to suppress his communications with Ms. Sexton, relying on the marital confidential communication privilege. In a pretrial motion hearing, the trial court addressed the marital privilege but reserved ruling until the time of trial. Although the trial court did not rule on the marital privilege issue in advance of the trial, the State conceded during its opening statement that "you can't force a wife to testify against her husband," suggesting a recognition that the exercise of marital privilege precluded admission of Ms. Sexton's testimony. The preliminary question, of course, is whether the prosecution's comment on the exercise of the privilege qualified as misconduct.

Tennessee Code Annotated section 24-1-201 governs the privilege afforded spouses as to marital communications. At the time of the crimes, section (b) provided that "confidential communications between married persons are privileged and inadmissible if either spouse objects." Tenn. Code Ann. § 24-1-201(b) (Supp. 1999).[19] While evidentiary

---

[19] In 2000, the statute was amended to add section (c). Tennessee Code Annotated section 24-1-
(continued...)

rules in some jurisdictions specifically preclude a prosecutor from commenting on any witness's invocation of a privilege not to testify, see, e.g., Ky. R. Evid. 511(a) ("The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel."), no formal rule exists in this state. Because of the dearth of reported cases in Tennessee on this issue, we have considered comparable cases from other jurisdictions.

The Alabama Court of Criminal Appeals has observed that no reference to spousal immunity should be permitted during the course of a trial:

> If for any reason the privileged spouse declines to testify for or against the other, that decision is final and the motives should not be questioned in a manner that would inure to the detriment of the defendant-spouse.
>
> If a failure of the witness-spouse to testify is to be construed as testimony or as a circumstance against the defendant-spouse, the privilege and the option to testify would be annulled. Under these circumstances the defendant-spouse would in all cases run the hazard of being convicted on a constrained, implied confession or admission, or to make explanations for her failure to testify, which might involve aspects of domestic privacy.
>
> When comment is made on an exercise of the marital privilege, the jury

---

[19](...continued)
201(c)(1) states:

In a criminal proceeding a marital confidential communication shall be privileged if:

(A) The communications originated in a confidence that they will not be disclosed;

(B) The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;

(C) The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and

(D) The injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation.

Because the State did not attempt to call Ms. Sexton as a witness at trial, the trial court was not forced to rule regarding the privilege. In turn, determining whether the pre- or post-amendment version of Tennessee Code Annotated section 24-1-201 was applicable was not an issue at trial, and, therefore, we do not address it here.

-49-

can infer that the defendant had something to hide, when in fact he can neither compel nor prevent his spouse from exercising that privilege. Under these circumstances, a jury could conclude that the defendant was preventing his spouse from testifying for the purpose of suppressing evidence.

Holyfield v. State, 365 So. 2d 108, 112 (Ala. Crim. App. 1978). The Michigan Court of Appeals similarly held in People v. Spencer, 343 N.W.2d 607, 610 (Mich. Ct. App. 1983), that a prosecutor may not comment on the defendant's exercise of the marital privilege. Several other states have adopted the view of the Alabama and Michigan courts. See, e.g., State v. Holcombe, 2009-1309 (La. App. 1 Cir. 2/12/10); 35 So. 3d 1084, 1086 (stating that the "claim of privilege . . . is not a proper subject of comment by the judge or counsel"). A Pennsylvania court held that allowing a prosecutor to imply a negative inference based on a spouse's failure to testify would "erode completely the spousal protection." Commonwealth v. Whiting, 517 A.2d 1327, 1332 (Pa. Super. Ct. 1986); see also People v. Harris, 762 P.2d 651, 661 (Colo. 1988) (stating that "[p]ermitting commentary on the defendant's invocation of [spousal privilege] is no less damaging to the privilege than allowing remarks alluding to an accused's invocation of the fifth amendment").[20] In Johnson v. State, 662 S.W.2d 368, 369 (Tex. Crim. App. 1984), the Texas Court of Criminal Appeals ruled that it is improper for a prosecutor to state or imply that a witness will not testify due to his or her fear of the defendant. Cf. Bixler v. Commonwealth, 204 S.W.3d 616, 627 (Ky. 2006) (citing a state evidentiary rule in ruling that counsel may not comment on a claim of privilege); Hylton v. State, 688 P.2d 304, 305 (Nev. 1984) (relying on a state procedural rule which bars prosecutors from commenting on a claim of privilege to find prosecutor misconduct).

Guided by the principles developed in these cases,[21] we hold that no comment should be made on the exercise of marital privilege. Thus, the statement that "[Ms. Sexton's] given

---

[20] In the context of a defendant invoking his constitutional right against self-incrimination, this Court in Felts v. State, 354 S.W.3d 266, 282 n.10 (Tenn. 2011), stated that a "prosecutor's direct reference to a criminal defendant's failure to testify in his own defense is a violation of the Fifth Amendment privilege against compelled self-incrimination." (citing Griffin v. California, 380 U.S. 609, 613-14 (1965)). Hence, the Court in Felts warned that "[p]rosecutors who choose to comment in opening statements upon a defendant's potential trial testimony should be mindful of the boundaries imposed by the Fifth Amendment." Felts, 354 S.W.3d at 282 n.10.

[21] While these cited cases deal with rules and statutes from numerous jurisdictions, including variations of the marital privilege that are different than Tennessee's martial communications privilege, see, e.g., Holyfield, 365 So. 2d at 110-11 (witness spouse may decide whether or not to testify for or against the defendant spouse); Spencer, 343 N.W.2d at 610 (spouses may not testify against each other unless the defendant spouse gives consent), the principle is the same: commenting on the claim of privilege undermines the privilege itself.

an interview and she later even testifies against [the Defendant]" was improper. While testimony during trial did establish that Ms. Sexton had talked to police several days after the murders, the prosecution's assertion that she had previously testified against the Defendant at the preliminary hearing not only made reference to inadmissible evidence, but also served to frustrate the very purpose of the privilege. The prosecution's apparent aim was to imply what the Alabama court cautioned against in Holyfield, "that the defendant was preventing his spouse from testifying for the purpose of suppressing evidence." Holyfield, 365 So. 2d at 112. The benefit of the marital confidential communications privilege is negated if a prosecutor is permitted to comment on the privilege during either opening statement or final argument. By telling the jury that Ms. Sexton previously testified against the Defendant, but that she could not be compelled to testify at trial, the State invited an inference that her previous testimony was unfavorable to the Defendant and that the Defendant was claiming the privilege to suppress incriminating testimony by Ms. Sexton. Thus, commenting on the privilege was improper.

## B. Trial Testimony

As previously indicated, the testimony pertaining to the Defendant's refusal to take a polygraph examination should have been excluded. Questions submitted on behalf of the State elicited improper references to the polygraph issue. It is difficult to imagine the prosecution's lack of awareness of the rule prohibiting such references.

While argued in unrelated sections in his brief, the Defendant also contends that references by the prosecution to the .22 rifle found in his residence and the testimony regarding his speeding violation qualified as prosecutorial misconduct. Moreover, the Defendant not only claims that the trial court erred by failing to suppress the evidence that was taken from the Defendant's automobile, but also asserts that the prosecution was guilty of misconduct by introducing the evidence seized. We disagree for reasons that have been previously expressed.

The Defendant further asserts that "the prosecution erred . . . when it failed to correct Agent Brakebill's testimony that he saw a typed statement for [the] Defendant, which . . . purportedly contained the express consent to search [the] Defendant's automobile." For the reasons previously set out in the sections of this opinion addressing those issues, we again disagree.

Finally, we conclude that the prosecution's questioning of Detective Alvarez and Agent Brakebill that pertained to the conduct of Ms. Sexton during the course of the investigation was not improper. As the Defendant submits in his brief, this included testimony from Detective Alvarez and Agent Brakebill that the police locked the door of the precinct for security purposes when interviewing Ms. Sexton; moved her to another location

when the Defendant arrived at the precinct because they did not feel comfortable with her being there; found her a place to stay at a safe harbor home in an adjacent county on the night of her interview with police; and arrested the Defendant the day after Ms. Sexton's interview with police. We disagree with the Defendant's contention that these questions regarding the questioning of Ms. Sexton "served no purpose but to imply to the jury that Sherry Sexton had implicated her husband in the murder allegations." These facts were relevant as to the Defendant's reaction to the police investigation of the murders, from which the jury was entitled to make reasonable inferences, including whether he was attempting to either thwart the investigation or manipulate its results.

## C. Closing Argument

The Defendant also insists that the State was guilty of prosecutorial misconduct during closing argument in both the guilt and penalty phases of the trial. Few of his allegations of misconduct during final arguments contain references to the record and one of the allegations, like some of those relating to trial testimony, is listed in a different section of the Defendant's brief.

The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such[] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131. The United States Supreme Court has observed, however, that prosecutors, by virtue of the high standards of public office, "may strike hard blows, [but are] not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). "[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Id. For example, asking a jury to "do its duty" by sending a message to the community is an impermissible plea for general deterrence and serves as an example of prosecutorial misconduct. Cauthern, 967 S.W.2d at 737. As we observed in State v. Thomas, 158 S.W.3d 361 (Tenn. 2005), although "[a]ttorneys have great leeway in arguing before a jury and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion, . . . [t]he

State is more limited . . . due to the prosecutor's role as a seeker of justice, rather than a mere advocate." Id. at 412-13 (appendix).

As properly recognized by the Court of Criminal Appeals, there are five general areas of potential prosecutorial misconduct related to closing argument:

(1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw. (2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant. (3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. (4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. (5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Goltz, 111 S.W.3d at 6 (citations omitted); see also American Bar Association, Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 (1970). All except for the first area of concern identified in Goltz have some applicability to the Defendant's claims of improper closing argument by the State.

### i. Guilt Phase

At the conclusion of the guilt phase of the trial, the prosecution, while acknowledging that witnesses Adams, Mason, and Ms. Swallows were "far from perfect" individuals, argued that their testimony comprised a "three-legged stool"—that is, considering the testimony together formed a solid foundation for a verdict of guilt. Even though the Defendant failed to object, the Court of Criminal Appeals ruled that these comments did not amount to an improper vouching, as prohibited by Goltz area two, for the credibility of the witnesses. Sexton, 2010 WL 5054428, at *28. We agree entirely with that assessment.

After contending that the murders were clearly premeditated and that the only issue was whether the Defendant or someone else committed the crime, the prosecution also argued that the Defendant knew that the door to the Goodman residence was unlocked on Saturday nights and further commented as follows:

The fate of the rain almost made three victims here. Had [E.G.] gone home and not decided to stay at Vella's awhile, had she been a fourth person in that

-53-

house between 8:45 and 11:00, she would have been the third victim. Fortunately, she wanted to stay with her aunt a while and she wasn't there. And the intervening fate of rain didn't cause her to be a victim.

The Defendant did not object at trial,[22] but now implies that the argument was designed to inflame prejudice, prohibited by Goltz area three. While not condoning the argument, the Court of Criminal Appeals addressed the merits of the claim and concluded that the comment did not affect the verdict. Sexton, 2010 WL 5054428, at *29. The comment, in our view, was made in the context of the State's theory that the Defendant knew the layout of the house, knew those living there, and knew that when E.G. went to the races, the door was left open because she typically returned home after midnight. Thus, the argument bore a relationship to the identification of the Defendant as the murderer. Further, the argument was relevant to evidence that the Defendant had made significant efforts to avoid detection, and, by implication, sought to leave no witnesses to the murder of Mr. Goodman. In consequence, the argument did not cross the line of impropriety.

During argument on behalf of the Defendant, defense counsel challenged the credibility of Detective Chambers by calling attention to his prior relationship with Mr. Goodman and by pointing out that the initial crime scene investigation did not reveal all of the spent bullet casings. In response, the prosecutor remarked, "I can't imagine how Wade Chambers lied to you." It is, of course, improper for a prosecutor to "express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence." State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989); see also State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). Stating that he could not personally imagine that Detective Chambers could lie, rather than pointing to the specific evidence which tended to undermine the contention of defense counsel, constituted vouching as prohibited by Goltz area two and was, therefore, improper.

The prosecution once again made reference to Ms. Sexton's interview with police and the Defendant's subsequent reaction when he arrived at the police precinct looking for her. As previously explained, this did not constitute prosecutorial misconduct. The Defendant also complains that the prosecution "referr[ed], repeatedly, to the out-of-court statements" of Ms. Sexton. The Defendant does not make references to the record or provide supporting argument for this claim. Our own review of the record, however, indicates that during closing argument, the State made a reference to the Defendant having "momentarily lost control" of Ms. Sexton during the course of the investigation. As indicated, any comment upon the exercise of marital privilege, no matter how veiled, is improper as generally stated

_____

[22] See State v. Reid, 91 S.W.3d 247, 283-84 (Tenn. 2002) (holding that the failure to object to an argument may serve as a waiver of the issue).

in Goltz area five.

The Defendant also contends that the prosecution improperly argued to the jury that upon the Defendant claiming to Ms. Crowley that he would kill Mr. Goodman if "he ever trie[d] to take [E.G.] from [him]," Ms. Sexton, who was present during the conversation, remarked, "Yes, Glen, I've told you, Glen, you ought not to do that." The record, however, establishes that Ms. Crowley actually said to the Defendant, "[Y]ou don't need to be making statements like that." Ms. Crowley testified that Ms. Sexton then remarked, "I tried to tell him that." The Defendant did not object. While the prosecution paraphrased rather than quoted Ms. Sexton's comment, the argument was based upon proof in the record, and, therefore, there was no impropriety.

After asserting that the trial court erred by allowing reference to threats made by the Defendant toward Mr. Goodman relating to the preparation of his tax returns, the Defendant also argues in the same section of his brief that this "error was compounded with further error by closing arguments of the prosecutor." At the conclusion of the guilt phase, the prosecutor made the following comments:

> You'll recall, of course, that [Ms. Crowley] was filling out their income tax and [the Defendant] was claiming [E.G.] as a dependent to get more money. And she thought that strange, because she thought [E.G.] was staying with [Mr. Goodman] . . . . I mean, they're not– they don't have to– they're not investigators for the IRS, but they want to make sure they get the information right.

In our view, this argument did not qualify as prosecutorial misconduct.[23]

The prosecution, in the context of providing the background for the Defendant's motivation to commit the murders, made at least three references to B.G.'s allegations to her school teacher and to Ms. Tharp of the DCS. As previously indicated, the trial court should have excluded the statements that B.G. made to Ms. Tharp during the DCS investigation. The prosecution, however, proceeded with the belief that the references were not improper. In light of our ruling that the evidence should not have been admitted, the argument, in retrospect, falls within prohibited areas three and four as outlined in Goltz. The same rationale applies to B.G.'s allegations to her school teacher. The fact of the allegation, coupled with admissible evidence offered through the other witnesses of the Defendant's animus toward Mr. Goodman, served to establish the Defendant's motive for the murders.

---

[23] A related statement made during closing argument in the penalty phase, as is subsequently addressed, was improper.

In view of the trial court's ruling allowing the details of the sexual abuse allegations to be placed in evidence, the argument by the prosecution did not qualify as misconduct. Nevertheless, by continually referring to the allegations—which should not have been admitted—the prosecution compounded the harmfulness of the erroneous evidentiary ruling. In hindsight, the better alternative would have been for the State to have avoided argument relating to the details of B.G.'s allegations, as related by Ms. Tharp, because of its overly prejudicial nature.

### ii. Penalty Phase

The Defendant also complains that, taken as a whole, certain statements made during final argument in the penalty phase of the trial, and as highlighted by the Court of Criminal Appeals, qualified as prosecutorial misconduct:

(1) You must look at the mitigating factor, as well you should, because sometimes a crime may be bad, but there may be some really compelling mitigating factors that would change that, and you should do that.

(2) [As to the Defendant's claim that i]t involved no other felonies. Well, it wasn't in the course of a bank robbery or something like that, but in effect, there were other felonies involved. It is a crime of aggravated burglary for a person to, without your permission, enter your house with the intent to commit an assault. Of course, normally, we think of burglary as people break in somebody's house to steal something but they could commit some other crime. So there [are] other crimes involved. Of course, no need to charge that in this case, as certainly, there was more than ample opportunity to impose the proper punishment with the things he was charged with. But that is another crime.

(3) He's responsible for these two deaths, he's responsible for any damage to his children, and he is responsible for the fact that you are considering the death penalty.

(4) I submit to you it is just as likely as children in Scott County or children involved in this case would be offended if he didn't get justice.

(5) He used these children to get money back from the income tax, and he used these children in the course of the child abuse allegation, and now he gets to use these children as the reason to escape the ultimate punishment.

(6) [B.G.] didn't have her mama [Ms. Sexton] to support her, so she had her

daddy. Mama was under control of the defendant.

(7) If, however, the aggravating circumstance is out– is not outweighed by the mitigation beyond a reasonable doubt; in other words, if you find that the bad aggravation of this murder– or these murders are not outweighed beyond a reasonable doubt by the mitigation in his favor, then death can be the punishment.

(8) [M]any many people experience childhoods and go on to lead productive lives, but you know that some of our greatest leaders experience this much childhood deprivation. . . . Some of our greatest leaders. What about Abraham Lincoln? Did Abraham Lincoln suffer from poverty? I believe he experienced a lot more poverty than [the Defendant] did. Did he suffer from disruptive relationships? Well, he lost his mother when he was little, and then he lost his stepmother when he was a little older. . . . Did he suffer from academic underachievement? . . . [The Defendant] was shuttled around from school to school. Abraham Lincoln had no school . . . . Did he suffer from lack of social support? . . . growing up in frontier America there was a whole lot less social support than there is today. So I believe Lincoln qualifies there. Did he suffer from parental absence? Yes he did. . . . What about a lack of emotional bonds? We know from history that Abraham Lincoln had a remote father. . . . What about the fact that he had an environment lacking in productive employment. . . . .

(9) [Y]ou should not choose to allow him to hide behind these children anymore.

Sexton, 2010 WL 5054428, at *29-30.

While addressing the Defendant's claim of prosecutorial misconduct, the Court of Criminal Appeals observed as follows:

Some of the prosecutors' statements, including statements that [the Defendant] committed aggravated burglary and income tax fraud, constituted an attempt to improperly sway the jury. However, when viewed in overall context, these statements were not so inflammatory as to require reversal. The evidence presented at the penalty phase clearly established the presence of the statutory aggravating circumstance. Evidence of mitigating circumstances was scant. The sentencing statute generally permits all evidence deemed relevant to the issue of punishment to be admitted in a capital sentencing proceeding. Any

improper conduct by the prosecutor was far outweighed by the strength of the evidence supporting the jury's finding that the aggravating circumstance outweighed proof of any mitigating circumstances. Based upon the proof presented at the penalty phase, it is clear that the prosecutor's comments did not affect the jury's sentencing decision.

Sexton, 2010 WL 5054428, at *30.

Initially, the Defendant alleges misconduct based upon the prosecutor's comments relating to the law in the capital sentencing context. At the outset, we note that it is not advisable for a prosecutor to attempt to state the law to the jury, a duty best left to the trial court. State v. Hatcher, 310 S.W.3d 788, 813 (Tenn. 2010) (quoting State v. Houston, 688 S.W.2d 838, 841 (Tenn. Crim. App. 1984)). The prosecutor argued to the jury as follows: "You must look at the mitigating factor[s], as well you should, because sometimes a crime may be bad, but there may be some really compelling mitigation factors that would change that, and you should do that." These comments, which encouraged the jury to evaluate the strength of the Defendant's mitigation evidence, cannot be said to have constituted misconduct.

In an effort to explain the role of aggravating and mitigating circumstances, however, the prosecution made the following comment:

> If, however, the aggravating circumstance is out– is not outweighed by the mitigation beyond a reasonable doubt; in other words, if you find that the bad aggravation of this murder– or these murders are not outweighed beyond a reasonable doubt by the mitigation in his favor, then death can be the punishment.

(Emphasis added). The trial court's jury instruction on this issue was as follows:

> If you unanimously determine that a statutory aggravating circumstance has been proved by the State beyond a reasonable doubt but that said statutory aggravating circumstance has not been proven by the State to outweigh any mitigating circumstances beyond a reasonable doubt, you shall . . . sentence the defendant either to imprisonment for life without the possibility of parole or to imprisonment for life.

(Emphasis added). The prosecutor's statements suggest that unless the mitigating evidence outweighs the aggravating circumstances beyond a reasonable doubt, then death is a possible punishment. This is not an accurate statement of law. Rather, for death to be a potential

punishment, the State must show that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, as the jury was instructed by the trial court. See Tenn. Code Ann. § 39-13-204(g)(1). Contrary to the prosecutor's argument, the burden was not on the Defendant to prove that mitigating evidence outweighed the aggravating factor beyond a reasonable doubt in order to avoid the death penalty. This misstatement of the law was improper, but was mitigated by the trial court's subsequent instructions to the jury.

During argument on behalf of the Defendant in the penalty phase, defense counsel had pointed out that the murders did not involve any other felonies. In response, the prosecution argued that while "it wasn't in the course of a bank robbery or something like that, . . . other felonies [were] involved. It is a crime of aggravated burglary for a person to . . . enter your house with the intent to commit an assault . . . [or] some other crime. So there [are] other crimes involved." The Defendant alleges that the argument was improper and the Court of Criminal Appeals agreed. Sexton, 2010 WL 5054428, at *30. In this appeal, the State's brief concedes that these comments may have "improperly adverted to other criminal conduct," but maintains that the comments did not affect the result of the proceeding, even though the trial court took no specific curative measures. We agree that the argument by the prosecution should have been confined to the single aggravating circumstance alleged in the notice seeking the death penalty—that the murders were committed for the purpose of avoiding, identifying with, or preventing arrest or prosecution. Tenn. Code Ann. § 39-13-204(i)(6); see also Tenn. R. Crim. P. 12.3(b)(2). To suggest that other felonies could be considered was misleading to the jury, a prohibited area of argument as indicated by the ruling in Goltz.

While arguing the presence of mitigating circumstances, the Defendant contended that by imposing the death penalty, the State would, in effect, punish the Defendant's children. It is well-settled that the prosecution is permitted to rebut any mitigating factors relied upon by the defense. Stephenson, 195 S.W.3d at 601 (appendix). Thus, the prosecution countered by advancing several arguments pertaining to the Defendant's children. The prosecution submitted that "he used these children to get money back from the income tax, he used these children in the course of the child abuse allegation, and now he gets to use these children as the reason to escape the ultimate punishment." In its brief for the Court, the State again concedes that the comment improperly referred to "other criminal conduct." The argument alleged that the Defendant improperly, and by implication illegally, used the children to acquire a tax refund. There was not a proper basis for such an argument.

Furthermore, in light of our earlier conclusion that the prosecution's references to the child sexual abuse allegations contributed to the harmful effect of the trial court's error in admitting the allegations, we likewise hold that the comment relating to the child sex abuse also had an adverse effect. The prosecution further exacerbated the error by commenting that "it is just as likely as children in Scott County or children involved in this case would be

offended if [the Defendant] didn't get justice"—a statement designed to incite the jury to punish the Defendant for acts not at issue in this trial and falling within Goltz area three. This is also analogous to the improper argument in Cauthern, where the prosecution asked the jury to "do its duty" by sending a message to the community and, therefore, qualifies as improper. 967 S.W.2d at 737.

A related argument is that the prosecutor committed misconduct when he said that "[the Defendant's] responsible for these two deaths, he's responsible for any damage to his children," and "you should not choose to allow him to hide behind these children anymore." Referring to the fact that Ms. Sexton was married to and lived with the Defendant, the prosecution argued that Mr. Goodman's daughter "didn't have her mama to support her . . . [because her] mama was under control of the Defendant." Those are, in our view, more legitimate responses to the defense counsel's claim that the death penalty would punish the children and falls within the wide latitude afforded closing arguments.

In response to the mitigating factors argued by the defense, the prosecution compared the poverty Abraham Lincoln experienced in his youth to that experienced by the Defendant, arguing that poverty was no excuse for the crimes. While the Defendant objected, the trial court ruled that the comments did not constitute "improper argument as far as response to proof raised by the defense either at trial or in closing argument," but eventually interceded, cautioning the jury that the reference was merely argument. In our view, these "remarks were aimed simply at the weight to be given the mitigating circumstances." See State v. Jordan, 325 S.W.3d 1, 61 (Tenn. 2010) (holding that such argument is proper). Even if erroneous, it is doubtful that such a curious comparison played any role in the death sentences. Cf. Smith, 527 S.W.2d at 739.

**D. Analysis**

In summary, there were several instances of prosecutorial misconduct. During opening statement, the prosecution made reference to B.G.'s allegations of sexual misconduct. Even though B.G. did not testify at the trial, the DCS employee who had conducted the investigation was permitted by the trial court to testify as to her conversations with B.G., her teacher, and two of the other children living in the Defendant's residence. While the intent of the prosecutor, having gained a favorable ruling regarding the admissibility of the evidence prior to trial, cannot be classified as improper, the effect of the argument was to once again underscore testimony that should not have been admitted as evidence. Further, the prosecution commented on the exercise of marital privilege in relation to the testimony of the Defendant's wife. Although this Court has not previously addressed the propriety of such a comment and the prosecution may not have been able to anticipate our ruling, the State must nevertheless be held accountable for the consequences. Further, during the course of the trial, the prosecution elicited testimony that the Defendant had first

volunteered to take a polygraph and later changed his mind. This was clearly improper. During the closing argument in the guilt phase of the trial, the prosecutor expressed his personal belief that Detective Chambers was truthful. While improper, the comment, in context, related primarily to spent bullet casings at the crime scene and, in our view, had no effect on the verdicts of guilt. During this segment of the trial, the prosecution again made references to B.G.'s allegations of sexual misconduct as related to the DCS employee.

In the penalty phase, the prosecution made several comments which crossed the line of propriety. The prosecution made an erroneous statement of law regarding the burden of proof for aggravating circumstances and mitigating factors. While providing adequate notice of the intention to seek the death penalty, only one of the statutory aggravating circumstances was cited as grounds; however, at the conclusion of the evidence relating to punishment, the prosecution improperly argued that the Defendant had committed "other felonies" during the murders, suggesting additional grounds for imposition of the death penalty. Further, the prosecution made additional references to the Defendant's alleged sexual misconduct and accused the Defendant of using his wife and children to generate a greater income tax refund than he was otherwise entitled to receive. The prosecution chose to describe these acts as "offenses to the children of Scott County," and asked the jury to mete out appropriate "justice"—a clear call for imposition of the death penalty not only for the murders, but also for the Defendant's use of the children for implicitly illegal means.

Factors to be considered in the event of instances of prosecutorial misconduct are as follows:

> (1) The conduct complained of viewed in context and in light of the facts and circumstances of the case. (2) The curative measures undertaken by the court and the prosecution.[24] (3) The intent of the prosecutor in making the improper statement. (4) The cumulative effect of the improper conduct and any other errors in the record. (5) The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). The ultimate test for evaluating prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Judge, 539 S.W.2d at 344.

---

[24] Other than as pointed out in section IV.C., the trial court did not provide curative instructions during the final arguments, but did caution the jury in its general charge that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them."

As indicated, there were several instances of prosecutorial misconduct. We have considered each of the factors in our efforts to assess their effect. Some had no impact in light of the other facts and circumstances of the case. The curative measures were minimal. Because of erroneous evidentiary rulings by the trial court, there were no curative measures as to the child sex abuse allegations, the polygraph references, or comments on the exercise of marital privilege. Those erroneous rulings, however, largely mitigated any improper intent on the part of the prosecution, an important factor to be considered. The proof of the Defendant's guilt was particularly strong. Perhaps none of the misconduct, standing alone, affected either the results of the guilt or penalty phases of the trial, but when considered as to accumulated effect, this calls into question the reliability of the death sentences. Our ultimate analysis regarding the effect of the instances of prosecutorial misconduct and the errors by the trial court on evidentiary matters, therefore, is deferred until the final section of this opinion.

### V. Challenges to the Death Penalty Statute

Preliminary to his argument that the death penalties were improperly imposed under the circumstances of this case, the Defendant has made a number of general challenges to the constitutionality of the death penalty statute, all of which this Court has addressed in prior cases. Initially, the Defendant argues that imposition of the death penalty violates due process because the aggravating circumstance alleged by the State was not included in the indictment. Citing Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002), he contends that in order to satisfy the Fifth Amendment due process and Sixth Amendment notice guarantees, any fact that increases the maximum penalty for a crime must be charged in an indictment. This Court has, of course, ruled on this issue on a number of occasions, holding that the failure to include an aggravating circumstance in the indictment as an element of the offense does not violate constitutional principles. See, e.g., State v. Hester, 324 S.W.3d 1, 77-78 (Tenn. 2010); State v. Kiser, 284 S.W.3d 227, 293 (Tenn. 2009) (appendix); State v. Reid, 164 S.W.3d 286, 312 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 58-59 (Tenn. 2004); Berry, 141 S.W.3d at 562; State v. Holton, 126 S.W.3d 845, 862-63 (Tenn. 2004); Dellinger, 79 S.W.3d at 466-67. In Berry, this Court distinguished the holdings in Apprendi, Ring, and Blakely v. Washington, 542 U.S. 296 (2004), as being based upon the Sixth Amendment right to trial by jury, as the United States Supreme Court did not "extend the Fifth Amendment right to presentment or grand jury indictment" to the states. Berry, 141 S.W.3d at 560.

Second, the Defendant asserts that a death sentence violates the fundamental right to life and does not promote any compelling state interest. Several of our cases have specifically rejected this challenge. See, e.g., Hester, 324 S.W.3d at 80; Bush, 942 S.W.2d at 523.

Third, the Defendant contends that the jury instructions required jurors to unanimously agree on the life sentence in violation of the holdings in Mills v. Maryland, 486 U.S. 367, 384 (1988) and McKoy v. North Carolina, 494 U.S. 433, 444 (1990), which prohibit a requirement that juries reach unanimous agreement as to the existence of mitigating circumstances. The Tennessee Pattern Jury Instructions, as charged by the trial court, provide as follows: "[t]here is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance." T.P.I.–Crim. 7.04(a), 7 Tenn. Practice: Tennessee Pattern Jury Instructions Criminal (15th ed. 2011). This is not violative of the mandate in Mills and McKoy. Again, our prior cases have specifically rejected this argument. See, e.g., Kiser, 284 S.W.3d at 292-93 (appendix) (holding that the requirement for the jury to unanimously agree on a life sentence does not run afoul of Mills and McKoy); State v. Ivy, 188 S.W.3d 132, 163 (Tenn. 2006) (same); Thompson, 768 S.W.2d at 250-51 (finding that the jury instructions did not violate Mills).

Fourth, the Defendant argues that the sentence of death is in violation of international treaties and laws. Because the Defendant neither offered argument nor cited any authority in his brief, the issue may be treated as waived. See Tenn. R. App. P. 27(a)(7) (requiring the brief of the appellant to contain argument on each issue raised). Further, this Court has consistently denied this challenge. See, e.g., Hester, 324 S.W.3d at 80; State v. Odom, 137 S.W.3d 572, 597-600 (Tenn. 2004) (appendix).

As his final general challenge to the propriety of the death penalty, the Defendant asserts the following grounds based in due process protections: (a) the statute allows the arbitrary and capricious imposition of the death penalty because it fails to properly narrow those eligible for death; (b) the statute divests the jury of its ultimate responsibility to determine the life and death decision because of its mandatory language; (c) the statute allows discrimination on the basis of location of the offense, the race of the defendant and victim, the gender of the defendant and victim, and the economic status of the defendant and victim; (d) the statute shifts the burden of proof to the defendant; (e) the procedure outlined by our statute improperly permits the prosecution to make the final closing argument; (f) the statute requires that the mitigating circumstances must outweigh the aggravating circumstances in order to avoid the death penalty; and (g) the procedure is constitutionally infirm for failing to provide a meaningful proportionality review and require jurors to make findings of fact in regard to mitigating circumstances.

The Court of Criminal Appeals properly concluded that each of these arguments has been previously considered and rejected by this Court. Sexton, 2010 WL 5054428, at *34-35. In State v. Keen, 926 S.W.2d 727, 743 (Tenn. 1994), we ruled that our death penalty statute properly narrowed the pool of those eligible for death, and we also found no fault with the provision authorizing the prosecution to make the final argument to the jury. In State v.

Brimmer, 876 S.W.2d 75 (Tenn. 1994), this Court, while rejecting the final argument challenge, id. at 87 & n.5, also considered and rejected the challenge that the mandatory language of the statute divested the jury of its responsibility to impose alternative sentences to the death penalty. Id. at 87; see also State v. Smith, 857 S.W.2d 1, 22 (Tenn. 1993) (explaining that this issue had been addressed previously and the death penalty statute "'does not in any way constitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the constitution'") (quoting State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990)).

Allegations that our death penalty scheme is imposed in a discriminatory manner based upon location of the offense, race of the defendant and victim, gender of the defendant and victim, and economic status of the defendant and victim have also been rejected in our prior holdings. See, e.g., Brimmer, 876 S.W.2d at 87 & n.5; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 23. The argument that the statute shifts the burden of proof to the defendant has also been rejected. See, e.g., State v. Austin, 618 S.W.2d 738, 742 (Tenn. 1981); State v. Dicks, 615 S.W.2d 126, 130-31 (Tenn. 1981). This Court has also rejected the challenge that our death penalty statute is unconstitutional as requiring mitigating factors to outweigh the aggravating circumstances in order to receive a life sentence. State v. Bane, 853 S.W.2d 483, 488-89 (Tenn. 1993). As his last due process challenge, the Defendant argues that the death penalty statute does not provide meaningful proportionality review and fails to require the jury to make findings of fact as to mitigating circumstances. A constitutional challenge to the statute for its failure to require jurors to make findings of fact as to claims of mitigating circumstances has also been rejected. See, e.g., Thacker, 164 S.W.3d at 256 (appendix). In State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), this Court ruled that "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." In summary, none of the Defendant's constitutional challenges have merit.

## VI. Statutory Review

By statute, appellate review of a sentence of death has "priority over all other cases" and, in every instance, requires determinations whether

(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (1997).

As explained below in section VII., the cumulative effect of the errors at trial necessitates a new sentencing hearing in this case. The State is not precluded on a remand for a re-sentencing from alleging previously unasserted aggravating circumstances. State v. Harris, 919 S.W.2d 323, 330-31 (Tenn. 1996). In light of the fact that the issues and evidence presented at the new sentencing may very well differ from that at the original sentencing hearing, we pretermit those issues here. Accordingly, we will not evaluate the arbitrariness of the Defendant's death sentence, the sufficiency of the evidence supporting the aggravating circumstance, whether the aggravating circumstance outweighed the mitigating circumstances, or whether the Defendant's sentence of death was disproportionate to the same penalty imposed in other cases. Tenn. Code Ann. § 39-13-206(c)(1).

## VII. Accumulated Errors

As his final issue, the Defendant contends that the various errors committed during the guilt and penalty phases of the trial warrant either a new trial or a new sentencing hearing. He argues that errors that might have been deemed harmless on an individual basis may aggregate to the point of requiring reversal. See Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992) (finding that errors in proceedings, "considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death"); cf. Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978) (noting, in the context of an ineffective assistance of counsel claim, that the "absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense[, as] prejudice may result from the cumulative impact of multiple deficiencies").

The harmless error analysis, as articulated in Tennessee Rule of Appellate Procedure 36(b),[25] "'recognizes that a person accused of a crime is entitled to an essentially fair trial and that a person convicted of a crime as a result of an essentially fair trial is not entitled to have his or her conviction reversed based on errors that, more probably than not, did not affect the verdict or judgment.'" State v. Ferrell, 277 S.W.3d 372, 380 (Tenn. 2009) (quoting Rodriguez, 254 S.W.3d at 373-74). The analysis is not merely "a calculation of whether sufficient evidence exists to support the conviction," but instead requires this Court to carefully examine the entire record in order "to determine whether the non-constitutional error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Id. (internal quotation marks omitted).

_____

[25] "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

Initially, the trial court here should not have excused prospective jurors based only upon the written answer to Question 33, which related to their qualifications to serve in a capital case. As repeatedly set out in this opinion, the trial court should have excluded altogether Ms. Tharp's detailed recitation of B.G.'s allegations of sexual misconduct. The allegations, graphic and in detail, were of such a serious nature that they would have served as a basis for a separate charge of rape of a child, a Class A felony. Because the State made reference to the allegations in opening statement, and Ms. Tharp was the State's initial witness at trial, the admission of the evidence infected the proceedings. This error was magnified by the fact that the sexual abuse allegations related directly to the single statutory aggravating circumstance asserted by the State. Further, the trial court should have also excluded any reference to the Defendant's refusal to submit to a polygraph examination and, at a minimum, immediately provided curative instructions.

In addition to the error related to the jury questionnaire and the errors allowing what should have been inadmissible testimony, there were, as indicated, instances of prosecutorial misconduct. The opening statement, critical of the exercise of marital privilege in regard to Ms. Sexton's testimony, was improper. Moreover, during the penalty phase of the trial, the prosecution suggested that the burden of proof was on the Defendant to demonstrate that the mitigating factors outweighed the aggravating circumstance. Although the trial court properly instructed the jury on this issue, none of the instructions could have successfully cured, in the context of argument on the single aggravating circumstance, the prosecution's references to "other felonies" occurring during the course of the murders, or accusations by the prosecution that the Defendant had "used" the children in his residence for the purpose of income tax fraud or, in the case of B.G., sexual abuse. Moreover, the prosecution called on the jury to "mete out justice," in the form of the death penalty, "for the children of Scott County." All of those comments by the prosecutor, especially the numerous references to the child sex abuse allegations—detailed, graphic, and inflammatory—combined to call into question the reliability of the capital sentences. When the cumulative effect of errors in a trial casts doubt on the reliability of a verdict, relief is warranted. See Taylor v. Kentucky, 436 U.S. 478, 487-88, 488 n.15 (1978) (holding that "the combination of the skeletal [jury] instructions, the possible harmful inferences from the references to the indictment, and the repeated suggestions that petitioner's status as a defendant tended to establish his guilt created a genuine danger that the jury would convict [him] on the basis of those extraneous considerations, rather than on the evidence introduced at trial"); see also Hester, 324 S.W.3d at 76-77; cf. State v. Zimmerman, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991). For these reasons, each of the verdicts of death must be reversed and new sentencing trials ordered. See, e.g., State v. Odom, 928 S.W.2d 18, 33 (Tenn. 1996); State v. Stephenson, 878 S.W.2d 530, 557-58 (Tenn. 1994).

Aside from the unfairly prejudicial nature of the inadmissible evidence and the

inappropriate argument by the prosecution, however, the proof of guilt for each of the two murders was simply overwhelming. The dismissal of prospective jurors based exclusively on their response to Question 33, the errors as to the admission of evidence and the overly zealous prosecutorial commentary, in our assessment, had no effect whatsoever on the verdicts of guilt for first degree murder. When confronted with the investigation by DCS, the Defendant immediately blamed Mr. Goodman. An officer overheard the Defendant remark, in a pointed reference to Mr. Goodman, that he might go to jail for murder, but not for a child sex abuse charge. Earlier, while making preparations for his income tax returns, the Defendant threatened Mr. Goodman's life in connection with issues relating to the support of the eldest of Ms. Sexton's daughters. When advised by Detective Alvarez that Mr. Goodman planned to file a change of custody suit, the Defendant searched for a weapon and informed co-worker Adams that he intended "to take care of the matter before it could escalate." After gaining possession of a .22 caliber rifle from his friend Mason, he explained that he had to "take care of some business in Scott County." The Defendant knew that the Goodman residence would be unlocked on the night of the murders. Because he had lived there, he was completely familiar with not only the location of the Goodman residence, but also the interior layout. After the murders, an officer found a Dollar Store receipt in the Defendant's vehicle, which documented the purchase of a fleece sweatshirt and pants only hours before the murder.

Most importantly, however, was that the Defendant confided to at least three of his friends that he had committed the crimes. First, he told Mason that he had shot and killed Mr. Goodman. Afterwards, he informed Adams in great detail how he traveled to Scott County to shoot the Goodmans and disposed of potentially incriminating evidence afterward. Finally, the Defendant used explicit terms to inform Ms. Swallows of the manner in which he had killed the Goodmans. Under these circumstances, we can hold with assurance that the errors committed in the course of the trial did not affect the reliability of either of the first degree murder convictions.

**Conclusion**

The verdicts of guilt for the first degree murders of Stanley Goodman and Terry Goodman are affirmed. Because of the improper striking of jurors based solely on the questionnaire, the prejudicial error in the admission of evidence, and the improper comments by the prosecution during the opening statement and closing arguments, the verdicts imposing death sentences for each murder must be set aside. The cases are remanded to the trial court for new sentencing hearings. It appearing that the Defendant is indigent, costs of the appeal shall be taxed to the State.

_____
GARY R. WADE, JUSTICE